**UNITED STATES of America and the United States Postal Service, Plaintiffs,**

v.

**CITY OF PITTSBURG, CALIFORNIA, Defendant.**

**No. C–78–2910–WWS.**

United States District Court, N. D. California.

April 2, 1979.

George Christopher Stoll, Asst. U. S. Atty., San Francisco, Cal., for plaintiffs.

John R. Shaw, City Atty., Pittsburg, Cal., for defendant.

## ORDER GRANTING SUMMARY JUDGMENT

WILLIAM W. SCHWARZER, District Judge.

In this action, the United States and the United States Postal Service seek declaratory and injunctive relief against enforcement of a recent amendment to an ordinance of the City of Pittsburg, California, which purports to prohibit letter carriers from crossing private lawns without the prior consent of the owner or occupant of the property. The amendment complained of added the second paragraph to the City's general trespass ordinance, which now states:

> 9.64.010. Trespassing on Private Property.
>
> It is unlawful for any person to go upon or to remain on any private property without the express consent of the owner, or lessee, or other person in charge thereof.
>
> No United States Postal Letter Carrier shall be allowed to cross the lawns of private property owners, lessee, or persons in charge thereof, without the prior express consent of the owner, lessee, or other person in charge thereof.

> Express consent by the owner, lessee or other person in charge of the premises may be satisfied either in writing or by direct verbal communication by such person.
>
> Except as herein provided, this section does not apply to public officers or employees acting pursuant to law.

The matter is before the Court on cross-motions for summary judgment.

### I.

■ The National Association of Letter Carriers has moved to intervene on the side of defendant. It asserts that the question whether letter carriers should utilize shortcuts, including cutting across lawns, is a source of continuing disputes between itself and the Postal Service and that it therefore has an interest relating to the subject matter of the action. Fed.R.Civ.P. 24(a)(2).[1] While the Ninth Circuit has rejected the notion that Rule 24(a)(2) requires a specific legal or equitable interest, see *Blake v. Pallan*, 554 F.2d 947, 952 (9th Cir. 1977), it is far from clear that a labor organization's general economic interest in a restrictive regulation such as Pittsburg's trespass ordinance would qualify. The mere fact that the outcome of the controversy between the government and Pittsburg may affect the Association's bargaining position does not seem to give rise to a protectible interest in the litigation. *Cf. United States v. Simmonds Precision Products, Inc.,* 319 F.Supp. 620, 621 (S.D.N.Y.1970). The Court doubts, moreover, that the Association can be said to be situated so that "the disposition of the action may . . . impair or impede [its] ability to protect that interest . . . ." Rule 24(a)(2). The Association's interest is in the wages and working conditions of its employees, and the arena for the protection of that interest is the collective bargaining

1. Rule 24(a) provides:

   *Intervention of Right.* Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede *his* ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

process, including the grievance procedure. This action does not enter into that domain.

The proper role of the Association in this proceeding should be as amicus curiae. Inasmuch as the Court previously granted the motion to intervene at oral argument, however, and no delay or prejudice will result from permitting the Association to remain as an intervenor, the prior ruling will be allowed to stand.

## II.

■ The threshold question before the Court is whether the action is ripe for judicial relief. Federal courts should not rush to judgment where the validity of state or local laws or regulations is at issue. The continuing vitality of our federal system rests on a healthy respect for the integrity of local government.

■ This case, however, involves direct interference with the exercise of the powers of the federal government itself. The imminent threat of enforcement of a local criminal ordinance against employees of the federal government performing the duties of their employment is a sufficient basis for assumption of jurisdiction.

Postal services are performed by the federal government under the authority of Article I, Section 8, of the Constitution, which vests in Congress:

Power . . . To establish Post Offices and post Roads.

Since the adoption of the Constitution, Congress has from time to time adopted legislation in the exercise of its postal power, beginning with the creation of the office of postmaster general in 1789.[2] On July 1, 1863, Congress first established free letter carrier service in 49 cities in the northeastern United States, and this soon became the principal mode of mail delivery.[3] And in 1970, in an effort to modernize the postal system, Congress adopted the Postal Reorganization Act. Pub.L. No. 91–375, 84 Stat. 719 (codified at 39 U.S.C. § 101 et seq.). That act contains a statement of postal policy which declares, among other things, that:

The Postal Service shall have as its basic function the obligation to provide postal services to bind the Nation together through the personal, educational, literary, and business correspondence of the people. It shall provide prompt, reliable, and efficient services to patrons in all areas and shall render postal services to all communities.

.        .        .        .        .

In determining all policies for postal services, the Postal Service shall give the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail. (39 U.S.C. § 101(a), (e))

To promote expedition as well as economy, officials of the Postal Service periodically observe, measure and evaluate the routes of letter carriers to assure that a carrier's daily work load approximates eight hours. In recent years, the Postal Service has made a particular effort to have letter carriers utilize available shortcuts to promote efficiency. One important type of shortcut is for the carrier to walk across lawns rather than confine himself to sidewalks and walkways.

Since at least 1962, postal regulations have authorized carriers to cross lawns. A regional manual issued that year by the Post Office Department (the predecessor of the present United States Postal Service) stated:

Carriers may cross lawns while making deliveries if patrons do not object and there are no particular hazards to the carrier.

---

2. See D. Fowler, *Unmailable: Congress and the Post Office* 9 (1977).

3. See C. Scheele, *A Short History of the Mail Service* 91 (1970). The author quotes the Postmaster General's appeal for higher pay for postal employees in 1863: "[T]he letter carriers claim peculiar consideration. They travel everyday from early in the morning until late at night, in heat and cold and rain and snow, all through the cities, distributing letters and papers without compensation enough to pay house rent." See also G. Cullinan, *The United States Postal Service* 85 (1973).

That regulation was subsequently reissued and is now incorporated by reference in the published regulations of the Postal Service. 39 C.F.R. § 211.2(a)(3).

Although the regulation is phrased in permissive terms, the Postal Service has consistently taken the position that it is authorized to require letter carriers to cross lawns where appropriate in the absence of objections by the owner or occupant of the residence. It has taken that position in the exercise of its management authority to require carriers to deliver their routes as efficiently as possible by, among other things, taking all safe and available short-cuts, including crossing lawns. And it has insisted on retaining that authority throughout its collective bargaining relationship with the Association, in contract negotiations as well as arbitration.

These conclusions are confirmed by an arbitration award, issued December 23, 1976, by Paul J. Fasser, Jr. All parties rely on this award in this action and none questions its findings or conclusions. The award was made upon the grievance of a letter carrier who, after having complained that his route was too long, had been ordered by his supervisor to cross all lawns that he considered safe.

In the award the arbitrator reviewed at length the relevant practices of the Service and the negotiations between the Service and the Association bearing on the issue. He first summarized the negotiations leading to the 1975 National Agreement covering the letter carriers which reflect the Service's rejection of Association proposals that letter carriers shall not cross, or shall at least not be required to cross, lawns. The agreement as finally adopted incorporated the permissive language of the regulation quoted above.[4]

The arbitrator then analyzed the significance of the language that carriers "may cross lawns" in the absence of hazards and objections. He found that Postal Service management under the collective bargaining agreement had reserved the right to direct the work force, including the right to establish routes and to require carriers to use a travel pattern which would result in the most efficient delivery of the mail. And he concluded that, although discretion whether to cross a lawn rests in the first instance with the individual carrier, this discretion must be exercised with a view not only to conditions on the route but also to the carrier's obligation "to deliver his route in the most efficient manner reasonably possible." Thus, while a blanket requirement that all carriers must cross all lawns could not be imposed, management was found to have reserved authority to direct an inefficient carrier to adopt a different travel pattern which may include appropriate shortcuts such as crossing a lawn in the absence of hazards and objections.[5]

Following that award, the Service issued a statement of its official position and instructions as follows:

4. In spite of renewed Association efforts to negotiate a change, the language was carried forward without change into the 1978 National Agreement.

5. The award states in relevant part:
 The right of the Postal Service to expect Letter Carriers to use the correct travel pattern is not denied. Use of the correct travel pattern means that the Carrier will utilize the most efficient method of travel to effectuate delivery of the mail on his route. In order to accomplish this it may be necessary for him to take a shortcut across a lawn if the owner does not object and there are no apparent hazards to him or to the customer's property.
 A similar result was reached in a subsequent arbitration, cited by the Association, arising out of an attempt by the St. Louis Postmaster to require all letter carriers to cross substantially all lawns in the absence of a documented objection. 71 Lab.Arb. 1189 (BNA 1979). Finding such a blanket requirement to be contrary to the terms of the collective bargaining agreement, the arbitrator there relied on the Service's M–39 Handbook, which governs evaluation of routes. The handbook establishes the approved criteria, including:
 Whether the carrier's route of travel is the safest possible;
 Whether the travel pattern is efficient; and
 Whether the carrier takes obvious shortcuts. The arbitrator concluded that the decision whether lawns are to be crossed requires the exercise of judgment by both the carrier and management in the light of various established criteria.

A letter carrier must perform his duties and travel his route in precisely the same manner on inspection day as he does throughout the year. Therefore, if a letter carrier normally crosses a particular lawn, or normally uses any other available shortcut, in the course of delivering his route, management may adjust his route on the assumption that the carrier will normally cross that lawn or take that shortcut, and may require and order such carrier normally to cross that lawn or use that shortcut.

In the circumstances where the carrier has not normally crossed all or some lawns or used all or some shortcuts during the previous year, management may, in adjusting routes, require and order the carrier to use the correct travel pattern, including crossing lawns and using shortcuts, where appropriate.

The findings of the arbitrator, which no party here disputes, as well as the undisputed affidavits submitted by the government, thus clearly establish that, notwithstanding the use of apparently permissive language, the authority to direct the crossing of lawns under the appropriate circumstances is a method of expediting mail delivery specifically reserved and asserted by Postal Service management.[6]

### III.

As the foregoing discussion demonstrates, while the Postal Service has not required its carriers to cross lawns generally, it has asserted and guarded its management authority to require carriers to deliver their routes efficiently, including taking of appropriate shortcuts. The Pittsburg trespass ordinance clearly intrudes into and abridges that management authority by precluding postal management from directing carriers to take a shortcut across the lawn, even where it is entirely safe and the owner or occupant has registered no objection.[7]

The government attacks the Pittsburg ordinance as invalid under the Supremacy Clause of Article VI of the Constitution:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . ."

The classic interpretation of this article is found in the statement of Chief Justice Marshall in *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 404, 4 L.Ed. 579 (1819):

If any one proposition could command the universal assent of mankind, we might expect it would be this—that the government of the Union, though limited in its powers, is supreme within its sphere of action. This would seem to result, necessarily, from its nature. It is the government of all; its powers are delegated by all; it represents all, and acts for all. Though any one state may be willing to control its operations, no state is willing

---

**6.** That the matter of crossing lawns, contrary to how it may appear at first glance to the uninitiated, is not insignificant is shown by the undisputed results of a 1976 Postal Service study of 50 routes. The study found that to deliver the mail without crossing lawns would take on the average an additional 51 minutes per route. The government points out that extrapolation of these results to the 98,345 carrier routes, for 303 delivery days per year, at $8 per hour, results in added costs of over $100 million annually. In Pittsburg, since the anti-lawn crossing ordinance became effective and has been observed, the aggregate delivery time of letter carriers has increased by between 14 and 25 hours per day.

**7.** See *Ex Parte Jackson,* 96 U.S. 727, 732, 24 L.Ed. 877 (1877):

The power vested in Congress "to establish post-offices and post-roads" has been practically construed, since the foundation of the government, to authorize not merely the designation of the routes over which the mail shall be carried, and the offices where letters and other documents shall be received to be distributed or forwarded, but the carriage of the mail, *and all measures necessary to secure its safe and speedy transit, and the prompt delivery of its contents.* (Emphasis added)

Concern with speed and regularity of mail service predates even the adoption of the Constitution. When Benjamin Franklin served as deputy postmaster general of the colonial postal system, beginning in 1753, he inspected postal routes and increased the speed of mail carriers and the frequency of their trips. W. Fuller, *The American Mail: Enlarger of the Common Life* 25–27 (1972).

to allow others to control them. The nation, on those subjects on which it can act, must necessarily bind its component parts. But this question is not left to mere reason; the people have, in express terms, decided it by saying, "this constitution, and the laws of the United States, which shall be made in pursuance thereof," "shall be the supreme law of the land," . . .

Marshall's words echoed those of Hamilton in *The Federalist* papers:

A government ought to contain in itself every power requisite to the full accomplishment of the objects committed to its care, and to the complete execution of the trusts for which it is responsible, free from every other control but a regard to the public good and to the sense of the people. (*The Federalist,* No. 31; Modern Library Ed. 1937 at 190)

The Supremacy Clause has perhaps a special relevance to the Postal Service, which historically has served to unify the country and to represent the central government in the lives of all citizens, no matter how remote from the capital.[8]

The leading case on the application of the Supremacy Clause to the exercise of the postal power is *Johnson v. Maryland,* 254 U.S. 51, 41 S.Ct. 16, 65 L.Ed. 126 (1920), holding that a postal employee could not be required by state law to obtain a driver's license to drive a mail truck. Pittsburg and the Association attempt to distinguish that decision on the ground that the state licensing requirement conflicted with specific federal regulations governing the fitness and competence of post office drivers. They state the issue to be whether federal laws and regulations have preempted the field of protecting private property against trespass. Relying primarily on cases decided under the commerce power, such as *Jones v. Rath Packing Co.,* 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977), and *Florida Lime & Avocado Growers, Inc. v. Paul,*

373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), they argue that state and local police power measures are not superseded by federal regulation, in the absence of a clear congressional intent to that effect.

■ But as the Supreme Court observed in *Hines v. Davidowitz,* 312 U.S. 52, 70, 61 S.Ct. 399, 406, 85 L.Ed. 581 (1941), cited by defendant, "whether supreme federal enactments preclude enforcement of state laws on the same subject" turns on "*[t]he nature of the power exerted* by Congress, the object sought to be attained, and the character of the obligations imposed by the law . . . ." (Emphasis added)

By treating this case as though it were one implicating the commerce power, Pittsburg and the Association deceive themselves and the Court. In *Johnson,* Justice Holmes made that crystal clear when he said:

The cases upon the regulation of interstate commerce can not be relied upon as furnishing an answer. They deal with the conduct of private persons in matters in which the States as well as the general government have an interest and which would be wholly under the control of the States but for the supervening destination and the ultimate purpose of the acts. Here the question is whether the State can interrupt the acts of the general government itself. (254 U.S. at 55, 41 S.Ct. at 16) See also *Mayo v. United States,* 319 U.S. 441, 445, 63 S.Ct. 1137, 87 L.Ed. 1504 (1943).

Thus the issue here is not whether Congress has manifested an intent to preempt the subject matter of the Pittsburg ordinance and oust local regulation. The issue is whether that ordinance intrudes into and interferes with activities of the federal government conducted in pursuance of its Constitutional power to operate the postal system. That it does so cannot be doubted. Here, as in *Johnson,* the federal government has asserted certain authority to im-

---

**8.** See W. Fuller, *The American Mail: Enlarger of the Common Life* 83–84 (1972). Madison, speaking of the postal power in *The Federalist,* said, "Nothing which tends to facilitate the intercourse between the states can be deemed unworthy of the public care." *The Federalist* No. 42; Modern Library Ed. 1937 at 278.

plement the postal power, i. e., the authority to insure the expeditious delivery of mail by, among other things, requiring carriers to cross lawns in appropriate circumstances. And here, as in *Johnson,* local action threatens to interrupt the federal government's exercise of its authority, i. e., precluding the Service from directing carriers under any circumstances to cross lawns.[9]

█ It may well be, as defendant suggests, that trespass regulations are a customary and unquestioned exercise of the police power but, as Justice Holmes analogized, "even the most unquestionable and most universally applicable of state laws, such as those concerning murder, will not be allowed to control the conduct of a marshal of the United States acting under and in pursuance of the laws of the United States. *In re Neagle,* 135 U.S. 1, 10 S.Ct. 658, 34 L.Ed. 55." 254 U.S. at 56–57, 41 S.Ct. at 16.[10] That, of course, is not to say that all local regulation is inapplicable to the conduct of federal agents. As noted in *Johnson,* "when the United States has not spoken, the subjection to local law would extend to general rules that might affect incidentally the mode of carrying out the employment—as, for instance, a statute or ordinance regulating the mode of turning at the corners of streets." *Id.* at 56, 41 S.Ct. at 16. Other types of general rules falling into that category might be those requiring cars to drive on the right side of the street and to stop for traffic lights. But in this case it is not necessary to determine how far local ordinances may reach for here, as in *Johnson,* the United States has spoken by asserting its authority, in the exercise of the postal power, to expedite the mail by requiring carriers to cross lawns when appropriate. Local regulations may not be permitted to interfere with the exercise of that authority.[11]

█ Pittsburg and the Association further contend, however, that Congress did

**9.** It is true that Pittsburg has not prohibited letter carriers categorically from crossing all lawns, or, for that matter, all private property. But the requirement that the prior express consent of a property owner or occupant must be obtained before a lawn may be crossed presents an obvious burden and impinges on the ability of the Postal Service to bring about use of the most direct and efficient routes. *Cf. Grover City v. United States Postal Service,* 391 F.Supp. 982 (C.D.Cal.1975).

**10.** The immunity of the postal service from local and state regulation had been established and accepted long before the *Johnson* decision. See L. Rogers, *The Postal Power of Congress,* in *John Hopkins University Studies in History and Political Science* 127–36 (1916). One of the earliest examples was the exemption of the post office from state Sunday observance laws; it was held, for example, that shoeing horses used by a stage company in transporting the mail was a necessity and therefore exempt from such laws. *Id.* at 129–31. In 1896, the Supreme Court invalidated an Illinois statute requiring trains to make off-route stops, holding that "a statute of the state which unnecessarily interferes with the speedy and uninterrupted carriage of the mails of the United States cannot be considered as a reasonable police regulation." *Illinois Central Railroad Co. v. Illinois,* 163 U.S. 142, 154, 16 S.Ct. 1096, 1101, 41 L.Ed. 107 (1896). And it was also held that it was an unlawful obstruction of the mail to execute civil process against horses driving a coach carrying mail, to serve a civil warrant on a mail carrier, thereby detaining him, or to stop a coach carrying the mail for failure to pay tolls. *United States v. Barney,* 24 Fed.Cas. 1014 (D.Md.1810) (No. 14,525); *United States v. Harvey,* 26 Fed.Cas. 206 (C.C.D.Md.1845) (No. 15,320); *United States v. Sears,* 55 F. 268 (D.Ky.1893).

These decisions suggest that, even had the Postal Service not promulgated the lawn crossing regulation or asserted its authority to require postal carriers to cross lawns in appropriate circumstances, a local ordinance would be unconstitutional if it prohibited a carrier from crossing lawns when he found it necessary to do so in order to perform his duty of delivering the mail efficiently. *See In re Neagle,* 135 U.S. 1, 10 S.Ct. 658, 34 L.Ed. 55 (1890) (U.S. marshal who committed murder in order to discharge his obligation to protect the life of Justice Field could not be subjected to state penal laws). However, because the Postal Service has asserted its management authority with respect to lawn crossing in the present case, it is unnecessary to reach this alternate ground.

**11.** There would be even less reason here to permit local interference with federal activity than in cases involving general rules governing public conduct, for here the ordinance merely seeks to protect private property against trespass. That purpose can readily be accomplished by action by the owners themselves, either by fencing their property or notifying the post office.

not intend to preempt local trespass regulations. They point to Section 1001 of the Postal Reorganization Act, which in relevant part provides:

(e) The Postal Service shall have the right, consistent with section 1003 and chapter 12 of this title and applicable laws, regulations, and collective-bargaining agreements—

(1) to direct officers and employees of the Postal Service in the performance of official duties. (39 U.S.C. § 1001(e)).

The reference to "applicable laws" is said to include local ordinances such as Pittsburg's. As the government points out, the argument begs the question, which is whether Pittsburg's ordinance *is* applicable to the Postal Service. It seems highly unlikely that by the addition of these few innocuous words, Congress meant to nullify 200 years of history and suddenly subject the operation of the Postal Service to local regulation of all sorts; without more compelling proof, the Court will not so hold.

The *Court's attention* has also been drawn to a recent decision of the United States District Court for the Eastern District of Missouri upholding the validity of an amendment to the trespass ordinance of the City of St. Louis prohibiting letter carriers from crossing private property except on generally used walkways. *United States v. City of St. Louis,* 452 F.Supp. 1147 (E.D. Mo.1978) (pending on appeal in the Eighth Circuit).[12] The Court rested its holding on the conclusion that the Postal Service had no power to direct carriers to cross private property. It relied first on the statutory definition of post roads, which includes letter carrier routes. 39 U.S.C. § 6105. Inasmuch as post roads have been regarded as public highways or routes, the court concluded that a letter carrier's route must be a public route. Since front lawns are pri-

vate property, the court reasoned, they cannot be part of a carrier's route.

Alternatively, the court held that for a postman regularly to cross a private lawn would violate the Fifth Amendment. Citizens, the court held, have a right to have their mail delivered without being compelled to register their objection to the crossing of their property.

This Court is compelled to disagree with these conclusions. First, it would be entirely unrealistic to assume, at least in the absence of some evidence of congressional intent, that by adopting a statutory definition of post roads, Congress meant to restrict the scope of the Constitutional postal power and to tie the hands of the Postal Service in achieving efficient delivery service by utilizing available shortcuts.

■ Second, whether the crossing of lawns by letter carriers may result in a taking of private property is not relevant to the question whether a local authority may prohibit such crossing. If a property owner can prove a case of inverse condemnation, he may be entitled to damages. But to this Court's knowledge it has never been the law that the Fifth Amendment authorizes anyone to block the activities of the federal government, even if those activities may ultimately give rise to a claim for compensation.[13]

■ Pittsburg's Tenth Amendment argument need not detain us long. Since the postal power is expressly delegated to the federal government, it clearly is not one reserved to the states. The states are not thereby precluded from dealing with common law trespass within the area of their competence. That area, however, does not include the federal government's performance of its Constitutional function.

---

12. The amendment states:

"Provided further, all delivery personnel, including letter carriers, whether employed by a private firm or government agency or government supported corporation, shall use sidewalks and accepted and approved walkways and shall refrain from traversing lawns or other private property not normally used

as a walkway by the general public in order to effect delivery."

13. This of course is not to suggest that the Postal Service is immune from the restraints imposed upon the federal government by the First and Fourth Amendments. *Cf. Ex Parte Jackson, supra,* 96 U.S. at 733.

### IV.

For these reasons, the Court concludes that the Supremacy Clause precludes Pittsburg from prohibiting letter carriers from crossing private lawns while delivering the United States mail. Were it not for the specific language in the ordinance making it applicable to letter carriers, it might be possible to construe the specific exemption for public employees acting pursuant to law as taking letter carriers out of its reach. The provisions of the second paragraph of the amended ordinance, however, expressly subjecting letter carriers to its terms, must be held to be invalid and unenforceable.

Accordingly, summary judgment must be granted to the United States and the Postal Service, declaring the Pittsburg ordinance invalid insofar as it applies to United States Postal Service employees.

IT IS SO ORDERED.