423 S.E.2d 914

**James K. SEXTON and Barbara Sexton, Appellants,**

v.

**PUBLIC SERVICE COMMISSION and Southern Jackson County Public Service District, a Public Utility, Appellees.**

**No. 21147.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 23, 1992.

Decided Nov. 13, 1992.

---

Robert A. Goldberg, Raymond Keener, III, King, Betts & Allen, Charleston, for appellants.

Robert R. Rodecker, McDonald & Rodecker, Charleston, for the appellee Southern Jackson County Public Service Dist.

Drexel M. Vealey, Legal Div., Public Service Comm'n, Charleston, for the appellee Public Service Comm'n.

MILLER, Justice:

James Sexton and Barbara Sexton, husband and wife, appeal a final order of the Public Service Commission of West Virginia (PSC), dated February 14, 1992. In this order, the PSC conditionally approved the application of the Southern Jackson County Public Service District (the District) for a certificate of public convenience and necessity to construct and operate a sewage treatment facility on property currently owned by the Sextons. On appeal, the Sextons assign three errors: (1) the location of the sewage lagoons violates regulations promulgated by the West Virginia Department of Health and Human Services (the Department) and constitutes a nuisance; (2) the PSC erred in finding the project economically feasible; and (3) the District failed to establish that public convenience and necessity exists. We find no error; accordingly, we affirm the final order of the PSC.

## I.

### Facts

On June 4, 1991, the District submitted an application to the PSC pursuant to W.Va.Code, 24-2-11 (1983),[1] and W.Va. Code, 16-13A-25 (1986),[2] for a certificate of public convenience and necessity to construct and operate a waste water treatment plant and collection system. The proposed waste water treatment facility would consist of two aerated sewage lagoons, a septic reception station, and a disinfection and post-aeration system, and would serve 194 customers in and around Fairplain, Jackson County. The sewage lagoons would be located on approximately six acres of the Sextons' 242-acre farm and would be approximately 430 feet from their home.

On July 8, 1991, having learned of the proposed location of the lagoons, the Sex-

---

1. W.Va.Code, 24-2-11(a), provides, in pertinent part:

   "No public utility, person or corporation shall begin the construction of any plant, equipment, property or facility for furnishing to the public any of the services enumerated in section one [§ 24-2-1], article two of this chapter, nor apply for, nor obtain any franchise, license or permit from any municipality or other governmental agency, except ordinary extensions of existing systems in the usual course of business, unless and until it shall obtain from the public service commission a certificate of public convenience and necessity requiring such construction[.]"

2. W.Va.Code, 16-13A-25, provides, in relevant part:

   "Unless the properties to be constructed or acquired represent ordinary extensions or repairs of existing systems in the usual course of business, *a public service district must first obtain a certificate of public convenience and necessity from the public service commission in accordance with the provisions of chapter twenty-four [§ 24-1-1 et seq.] of this code, when a public service district is seeking to acquire or construct public service property.*" (Emphasis added).

tons filed a protest to the District's application and a motion to intervene. The PSC granted the Sextons intervenor status, and on October 10, and 11, 1991, an evidentiary hearing was conducted at which all parties were represented by counsel.

Following the hearing, the administrative law judge (ALJ) issued a decision recommending that the District's application be denied. The ALJ based her recommendations upon the following conclusions:

"1. The Applicant has failed to establish that public convenience and necessity exists with regard to the project as proposed....

"2. The plant site, as proposed, has not received final approval from the appropriate state agencies and, therefore, is not in the public's best interest.

"3. The project is not economically feasible inasmuch as the property needed for the project has not been obtained and the final project costs cannot be determined."

On January 17, 1992, the District filed exceptions to the ALJ's recommendation with the PSC. In an order entered February 14, 1992, the PSC rejected the ALJ's recommendations and approved the District's certificate application, conditioned upon the land acquisition costs coming within the District's estimate. The Sextons appeal.

## II.

### A.

### *Buffer–Zone Requirements*

The Sextons' primary argument is that the proposed location for the sewage lagoons violates the buffer-zone requirements promulgated by the Department. These provisions establish distances that must be maintained between sewage treatment plants and occupied dwellings. As a guiding principle, the rules mandate that

the site should "be as far as practicable from any present built-up[.]" 64 W.Va. C.S.R. § 47–4–1.2. The regulations further provide that "[a]erated lagoons shall be located a minimum of 300 feet from the nearest occupied structure." 64 W.Va. C.S.R. § 47–4–11.4.2.[3] The Sextons concede, as they must, that the proposed lagoons comply with the minimum mandates of 64 W.Va.C.S.R. § 47–4–11.4.2; however, they argue that this regulation merely identifies a starting point for assessing the proper location.

In support of their argument, the Sextons direct our attention to the testimony of Harry Pitts, a professional engineer retained by them. Mr. Pitts testified that the minimum buffer-zone requirement was far from adequate because of the type of system proposed by the District and because of the topography of the surrounding area. Mr. Pitts concluded that "[t]he nature of the collection system ... makes the potential for serious nuisance and hazardous conditions much greater, perhaps a certainty as compared to a more conventional plant receiving and treating fresh sewage."

The District counters by highlighting the numerous weaknesses in Mr. Pitts' testimony. Although Mr. Pitts has an extensive background in sanitary sewer design, he admitted during cross-examination that he was not familiar with the type of system proposed and that the first time he reviewed the plans for the proposed plant was on the day of the hearing. Moreover, Mr. Pitts confessed that he had failed to contact officials at the Page/Kincaid Public Service District in Fayette County where the same treatment design was already in use. Indeed, Mr. Pitts conceded that he had made no effort to determine whether the Page/Kincaid facility experienced odor problems.

---

**3.** A table provided with the buffer-zone requirements lists the minimum distance for aerated lagoons as 100 feet, as opposed to 300 feet. William Herald, an employee of the Department, testified at the hearing that he assisted in promulgating the interpretative rules pertaining to the buffer-zone requirements for sewage

treatment facilities and that 100 feet was the actual minimum distance required. Mr. Herald testified that the distance of 300 feet appearing in 64 W.Va.C.S.R. § 47–4–11.4.2 was a printing error. For purposes of this opinion, we must assume that the buffer-zone requirement is 300 feet.

The District offered the expert testimony of Paul Ghosh, the District's design engineer. Mr. Ghosh testified that the collection system proposed was in compliance with all federal and state standards and that the system's design had been modified to avoid the odor concerns about which Mr. Pitts had speculated. Mr. Ghosh concluded that the proposed system and site location were the most cost-effective way to deal with the waste treatment problem in Jackson County.

Fred Hypes, an engineering supervisor with the West Virginia Division of Natural Resources (DNR), also testified on behalf of the District. Mr. Hypes stated that the aerated lagoons being proposed were "a common treatment technology that has been used throughout the State of West Virginia." Mr. Hypes further explained that the design of the proposed facility was identical to the Page/Kincaid Public Service District and he characterized it as "very, very conservative." Finally, Mr. Hypes warned that DNR strongly endorsed the project as proposed and that the failure of the District to secure a certificate of public convenience and necessity would likely cause DNR to revoke grant funds.

■ In *Broadmoor/Timberline Apartments v. Public Service Commission*, 180 W.Va. 387, 376 S.E.2d 593 (1988), we reviewed an order of the PSC in a case involving the jurisdiction of the PSC, and, in Syllabus Point 1, we stated our general standard for review:

> " ' "[A]n order of the public service commission based upon its finding of facts will not be disturbed unless such finding is contrary to the evidence, or is without evidence to support it, or is arbitrary, or results from a misapplication of legal principles." *United Fuel Gas Company v. The Public Service Commission*, 143 W.Va. 33 [99 S.E.2d 1 (1957) ].' Syllabus Point 5, in part, *Boggs v. Public Service Comm'n*, 154 W.Va. 146, 174 S.E.2d 331 (1970)."

■ Applying this standard, we conclude that the PSC did not err in finding that the proposed site satisfied the buffer-zone requirements. All the parties acknowledge that the distance of the proposed lagoons from the Sextons' home is approximately 430 feet, which exceeds the minimum buffer-zone requirement of 300 feet. In deciding whether, in this case, the distance should be greater than the minimum requirement, the PSC relied on ample evidence in the record to support the District's claim that the proposed location is both cost-effective and environmentally sound; thus, we are compelled to defer to the expertise and judgment of the PSC. Accordingly, we find the PSC's ruling that the project complies with the buffer-zone requirement is supported by substantial evidence, and we find no error.

## B.

### *Nuisance*

■ As a corollary, the Sextons vigorously contend that the proposed location of the lagoons constitutes a nuisance under our common law. Whether the construction of the sewage lagoons would constitute a nuisance does not defeat the PSC's jurisdiction to issue a certificate of public convenience and necessity under W.Va. Code, 24–2–11. Certainly, the PSC may assess, as it did in this case, environmental considerations with regard to the proposed facility; however, as we will point out in Part III, *infra*, the chief inquiry is the need of the public for the project. In this case, the District had been advised by DNR officials that it was not in compliance with the federal Clean Water Act because it did not have a secondary waste water treatment facility. This noncompliance is persuasive evidence that the proposed plant is for the public convenience and necessity.

■ The PSC is empowered by statute[4] to issue a certificate of public convenience and necessity. Although construction of a new facility proposed by a utility will often require the taking of private property

---

**4.** For the statutory requirements for issuing a certificate of public convenience and necessity, see notes 1 and 2, *supra*.

through eminent domain, in the absence of express statutory language, the PSC has no duty to review and decide issues that are inherent in the eminent domain proceeding.[5] Even if the facility creates a nuisance to the Sextons, this harm is simply an element of just compensation in an eminent domain proceeding. Courts have recognized in appropriate instances that a public facility's creation of a nuisance can be an injury to property and compensable in an eminent domain proceeding.[6]

Although this subject has not received a great deal of judicial attention, there are ample cases that hold that a public service commission, in the absence of specific statutory authority, is not empowered to determine whether particular property interests acquired or to be acquired by a utility are compensable in an eminent domain action. Likewise, the PSC may not render any type of monetary judgment for such property interests, as affixing the value of the property taken is the function of the trier of fact in an eminent domain proceeding. *See, e.g., Old State Util. Corp. v. Greenbrier Dev. Corp.,* 181 Ind.App. 697, 393 N.E.2d 785 (1979); *Central La. Elec. Co. v. Pointe Coupee Elec. Membership Corp.,* 182 So.2d 752 (La.App.), *writ refused,* 249 La. 119, 185 So.2d 529 (1966); *Wejac Utils., Inc. v. Davenport,* 269 So.2d 339 (Miss. 1972); *Davis–Moore Indus. Park v. Missouri Pac. R.R. Co.,* 210 Neb. 652, 316 N.W.2d 593 (1982).

■ Moreover, where a governmental entity lawfully exercises its right to take private property for public use, the affected landowner's remedy is the right to obtain compensation for the property taken. *See Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984); *Hurley v. Kincaid,* 285 U.S. 95, 52 S.Ct. 267, 76 L.Ed. 637 (1932); *Glosemeyer v. Missouri–Kansas–Texas R.R.,* 879 F.2d 316 (8th Cir.1989), *cert. denied,* 494 U.S. 1003, 110 S.Ct. 1295, 108 L.Ed.2d 473 (1990); *United States v. City of Pittsburgh,* 467 F.Supp. 1080 (N.D.Cal.1979), *aff'd,* 661 F.2d 783 (9th Cir.1981); *Department of Transp. v. Bonnett,* 257 Ga. 189, 358 S.E.2d 245 (1987); *Stewart v. City of Marshfield,* 431 S.W.2d 819 (Mo.App.1968); *Midgett v. North Carolina State Highway Comm'n,* 260 N.C. 241, 132 S.E.2d 599 (1963). As the United States Supreme Court explained in *Ruckelshaus v. Monsanto Co.,* 467 U.S. at 1016, 104 S.Ct. at 2880, 81 L.Ed.2d at 841:

> "Equitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking. *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 697, n. 18, [69 S.Ct. 1457, 1465, n. 18, 93 L.Ed. 1628, 1640 n. 18] (1949)." (Citations omitted; footnote omitted).[7]

Thus, we conclude that the Sextons' claim for damage to their property from the construction of the sewage lagoons is not an issue for the PSC to decide, but

5. In *State ex rel. City of Wheeling v. Renick,* 145 W. Va. 640, 652, 116 S.E.2d 763, 770 (1960), we said that the PSC could order a utility to extend services: "'[A] public service commission may, where its action is not unlawful, arbitrary, or capricious, order an extension of service for the inhabitants of such territory.'" *Quoting* 43 Am. Jur. *Public Utilities & Services* § 199. (Citations omitted). Obviously, such an order could necessitate the utility's exercise of its power of eminent domain, but this exercise would not be under the PSC's jurisdiction.

6. *See, e.g., United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946); *Portsmouth Harbor Land & Motel Co. v. United States,* 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287 (1922); *Sewer Improvement Dist. No. 1 v. Fiscus,* 128 Ark. 250, 193 S.W. 521 (1917); *Green Acres Land & Cattle Co. v. State,* 766 S.W.2d 649 (Mo.App. 1988); *Department of Transp. v. Bonnett,* 257 Ga. 189, 358 S.E.2d 245 (1987).

7. A property owner may bring a writ of mandamus against a governmental entity to compel it to bring an eminent domain proceeding. *See, e.g., State ex rel. McCormick v. Miller,* 171 W.Va. 42, 297 S.E.2d 448 (1982); *State ex rel. Rhodes v. West Virginia Dep't of Highways,* 155 W.Va. 735, 187 S.E.2d 218 (1972). We have also approved the use of an injunction where the entity having the right to condemnation has failed to exercise it before first obtaining the right to do so. *See Allen v. City of Charleston,* 90 W.Va. 131, 111 S.E. 485 (1922); *Lovett v. West Virginia Cent. Gas Co.,* 65 W.Va. 739, 65 S.E. 196 (1909).

rather is a matter that should be addressed in the eminent domain proceeding.[8]

### III.

### *Economic Feasibility*

The Sextons next argue that the PSC erred in issuing the certificate of public convenience and necessity because the project is not economically feasible. In support of this contention, the Sextons argue that the $50,000 set aside by the District to acquire the Sextons' six acres will not adequately compensate them. The only evidence in the record that this amount is inadequate is the testimony of Mr. Sexton. He estimated the total value of his 242–acre farm at between $550,000 and $650,-000, and speculated that the sewage lagoons would devalue the property between 25 and 75 percent. Because the amount allocated to acquire the property is less than the value assigned by the property owners, they argue the project is economically unfeasible.

Several considerations render this argument unsound. First, the PSC's order reserved final approval of the project pending the determination in the eminent domain proceeding of the amount for acquisition of the Sexton acreage. This reservation recognized that, if the cost of acquisition was substantially above the District's estimate, a further study of the project's economic feasibility and potential alternative sites would be made.[9] We find this approach eminently reasonable.

■ Furthermore, under W.Va.Code, 16–13A–25, a public service district must first obtain a certificate of public convenience and necessity before it can "acquire or construct public service property."[10] Thus, a public service district cannot exercise its right of eminent domain until it has received a certificate of public convenience

and necessity. As a consequence, in computing the cost of the project, the public service district will necessarily rely on estimates of the cost of the land acquisition. A certificate need not be withheld until the actual cost of acquisition is determined. If the PSC finds the estimates reasonable, it may issue the certificate.

To hold otherwise would ignore the statute's plain language that the certificate be secured before property acquisition. Moreover, to require the District to first acquire the property could result in the unnecessary expenditure of funds, inasmuch as the PSC might refuse to issue the certificate.

Finally, we disagree with the Sextons' argument that the only testimony of the property's value came from the landowner, Mr. Sexton; thus, the PSC had to accept his valuation, and, because it was substantially above the $50,000 estimate, the project should have been rejected. First, as we have earlier pointed out, the PSC does not adjudicate the value of property taken. More importantly, contrary to the Sextons' assertions, there is other evidence in the record estimating the value of their property.

For example, James Stover, the chairman for the District, testified that the Sextons' property had been appraised and that a report had been submitted to the District. The report estimated the fair market value of the entire estate at approximately $500,-000 and also valued the property taken. Based on the appraised fair market value, the District offered the Sextons $4,700 for the six acres of land taken and $45,200 for "damages" to the residue of the property.

■ Even though we have held that a landowner is competent to give an estimate of the value of his property in an eminent domain proceeding, we have never held that this valuation is conclusive. *See, e.g., West Virginia Dep't of Highways v. Sick-*

---

8. We are informed by the parties that an eminent domain action has been filed, but has been continued pending the outcome of this appeal.

9. An alternative site was proposed by the Sextons, but was rejected by the District because it would increase the project cost of $522,000 and would result in an average increase in the user

fee of $15.00 per month. The increased costs were due to the need for an access road, pumping station, bridge, creek relocation, and additional electricity costs.

10. For the text of W.Va.Code, 16–3A–25, see note 2, *supra.*

*les,* 161 W.Va. 409, 242 S.E.2d 567 (1978), *overruled on other grounds, West Virginia Dep't of Highways v. Brumfield,* 170 W.Va. 677, 295 S.E.2d 917 (1982); *Tennessee Gas Transmission Co. v. Fox,* 134 W.Va. 106, 58 S.E.2d 584 (1950). Rather, the PSC may rely on an appraisal report concerning the estimated value of the property to be taken and does not have to rely solely on the landowner's estimated value.

For the foregoing reasons, we reject the Sextons' argument that the project was not economically feasible because the District had not yet acquired the Sexton property.

### IV.

### *Public Convenience and Necessity*

The Sextons further argue that the District failed to present sufficient evidence that public convenience and necessity exist. We disagree. In issuing certificates, the PSC's primary concern is to "serve the interests of the public." *Lumberport–Shinnston Gas Co. v. Public Serv. Comm'n,* 165 W.Va. 762, 765, 271 S.E.2d 438, 441 (1980), *quoting Boggs v. Public Serv. Comm'n,* 154 W.Va. 146, 154, 174 S.E.2d 331, 336 (1970). *See also West Virginia–Citizen Action Group v. Public Serv. Comm'n,* 175 W.Va. 39, 330 S.E.2d 849 (1985).

The term "public convenience and necessity" is not defined in W.Va.Code, 24–1–1, *et seq.* The same term is used in our "Motor Carriers and Properties for Hire Act" found in W.Va.Code, 24A–2–5(a) (1980). In *Stowers & Sons Trucking Co. v. Public Service Commission,* 182 W.Va. 374, 378, 387 S.E.2d 841, 844 (1989), we construed W.Va.Code, 24A–2–5(a), and quoted this language from *Monongahela West Penn Public Service Co. v. State Road Commission,* 104 W.Va. 183, 192, 139 S.E. 744, 748 (1927):

"'Courts and Commissions construing statutes similar to ours have uniformly held that the necessity and convenience referred to is that of the public generally as distinguished from that of a number of individuals or a community, and that the inadequacy of the existing service and the convenience or necessity of the proposed service must both affirmatively appear from the evidence.'" (Footnote omitted).

*See also State ex rel. Twehous Excavating Co. v. Public Serv. Comm'n,* 617 S.W.2d 104 (Mo.App.1981); *Warminister Township Mun. Auth. v. Pennsylvania Pub. Util. Comm'n,* 185 Pa.Super. 431, 138 A.2d 240 (1958).

Thus, we conclude, as a general proposition, that where the PSC is authorized to issue a certificate of public convenience and necessity, in addition to any specific statutory guidelines, the PSC should consider the general public convenience to be served and the public necessity for it, having in mind the adequacy of any competing similar facilities.

In this case, the District has met its burden. On June 30, 1987, a DNR official wrote the chairman of the District to advise him that the District is "responsible for compliance with the federal Clean Water Act by July 1, 1988. In order to comply with the requirements of the Act, your [District] must have secondary waste water treatment facilities or better in place, operating under a valid WV/NPDES Permit and meeting required effluent limitations by the deadline[.]" Moreover, at the hearings on October 10 and 11, the majority of the public who testified agreed that there was a need for a sewage treatment facility in the county. Mr. Sexton himself testified that he felt such a project was necessary.[11] Today, Jackson County still does not have a single sewage treatment facility. Finally,

---

**11.** Indeed, in a letter dated October 7, 1985, to the editor of the *Jackson Herald* in Ripley, West Virginia, Mr. Sexton stated, in pertinent part: "My family and I moved to Jackson County nearly fourteen years ago to enjoy the outdoors and a cleaner environment. My kids use [*sic*] to play in the creeks and swim in the ponds. When hunting, I not uncommonly would drink from a clear fast flowing brook. I wouldn't dream of allowing my family to do these things today.

"I am writing to express my enthusiastic support for the sewer system as proposed by the Southern Jackson County Public Service District Commissioners."

the District has secured adequate funding for construction of the project and, thus, has demonstrated its ability to provide the necessary services.

## V.

### *Conclusion*

Accordingly, we affirm the final order of the PSC, dated February 14, 1992, granting the District a certificate for public convenience and necessity.

Affirmed.