665 S.E.2d 315

**MOUNTAIN COMMUNITIES FOR RESPONSIBLE ENERGY, Intervenor Below, Appellant**

v.

**PUBLIC SERVICE COMMISSION OF WEST VIRGINIA and Beech Ridge Energy, L.L.C.; West Virginia State Building and Construction Trades Council, AFL–CIO, Defendants Below, Appellees.**

**Alicia A. Eisenbeiss and Jeffrey C. Eisenbeiss, Intervenors Below, Appellants**

v.

**Public Service Commission of West Virginia and Beech Ridge Energy, L.L.C.; West Virginia State Building and Construction Trades Council, AFL–CIO, Defendants Below, Appellees.**

**Nos. 33375, 33376.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 9, 2008.

Decided June 23, 2008.

Dissenting Opinion of Justice Starcher July 17, 2008.

Justin R. St. Clair, Esq., Dalton Law Offices, Peterstown, WV, for Mountain Communities for Responsible Energy.

Jeffrey C. and Alicia A. Eisenbeiss, Renick, WV, *pro se.*

Lee F. Feinberg, Esq., Susan J. Riggs, Esq., Grant P.H. Shuman, Esq., Spilman Thomas & Battle, P.L.L.C., Charleston, WV, for Beech Ridge Energy, L.L.C.

Vincent Trivelli, Esq., The Calwell Practice, P.L.L.C., Morgantown, WV, for West Virginia State Building and Construction Trades Council, AFL–CIO.

John Auville, Esq., Richard E. Hitt, Esq., Charleston, WV, for West Virginia Public Service Commission.

PER CURIAM.

These consolidated cases are before this Court upon appeal of a final order of the Public Service Commission (hereinafter, the "Commission"). The appellant, Mountain Communities for Responsible Energy (hereinafter, "MCRE"), a nonprofit group, and co-appellants Alicia A. and Jeffrey C. Eisenbeiss, two local property owners, appeal the Commission's January 11, 2007, final order denying their petitions for reconsideration of its August 28, 2006, order, which conditional-

ly granted the application of the appellee, Beech Ridge Energy, LLC (hereinafter, "Beech Ridge"), to build a wind-powered wholesale electric generating facility. The West Virginia State Building and Construction Trades Council, AFL–CIO (hereinafter, the "Trades Council"), intervened in the matter before the Commission in order to ensure that the construction of the proposed facility would result in a substantial positive impact on the local economy and local employment as required by W.Va.Code § 24–2–11c(c) (2003). For the reasons set forth below, the Commission's final orders are affirmed.[1]

## I.

## FACTS

On November 1, 2005, the appellee, Beech Ridge Energy, LLC, applied to the Public Service Commission for a siting certificate pursuant to W.Va.Code §§ 24–2–1(c) (2003) and 24–2–11c. Beech Ridge sought approval from the Commission to build a 186 megawatt wind-powered electric generating facility,[2] to be located nine miles northeast of Rupert in Greenbrier County, West Virginia, and for a 13.8 mile 138 kV transmission line to connect the generating facility to Allegheny Power Company's Grassy Falls substation near Nettie in Nicholas County, West Virginia.[3]

Beech Ridge proposed to construct 124 wind turbines sized at 1.5 Megawatts, mounted on 262 foot tubular steel towers, in addition to 150 pole structures for the transmission line,[4] with a total project cost of $300 million. The turbines will span approximately 23 miles, with the generating facility footprint being approximately 300 acres along various rural ridgetops located in western and northwestern Greenbrier County. The turbines will be located on a 100,000 acre tract owned by MeadWestvaco Corporation.[5]

Beech Ridge maintains that the project will create more than 200 temporary construction jobs in addition to fifteen to twenty permanent jobs with a $35,000 average annual salary. Beech Ridge also entered into an agreement with the Greenbrier County Commission that ensures Beech Ridge will pay at least $400,000 per year, in either taxes or donations, to Greenbrier County for a period of twenty years. Moreover, the project is expected to result in a minimum of $200,000 in yearly tax revenue to the State, as well as contribute to a growth in tourism.

The Commission received a substantial amount of public comment concerning the project in the form of thousands of letters, with two-thirds to three-fourths of the letters opposing the project. On December 7, 2005, Mountain Communities for Responsible Energy filed its petition to intervene. On February 6, 2006, MCRE was granted intervenor status, along with co-appellants Alicia A. and Jeffrey C. Eisenbeiss, two local property

1. We also acknowledge and appreciate the contribution of *amici curiae*, Appalachian Power Company, MeadWestvaco Corporation, West Virginia American Water Company, West Virginia Oil and Natural Gas Association, Utilities Telecommunications and Energy Coalition of West Virginia, Inc., and Thomas Vance, to the legal arguments presented for our consideration herein.

2. Beech Ridge is owned by Invenergy Wind, LLC, which has financed the development, construction, and operation of more than ten major power generation facilities worldwide, totaling more than $1.5 billion. Beech Ridge states that it intends to maintain ownership throughout the project's development, construction, and operation. However, it may elect, at some point in the future, to sell partial ownership shares to separate passive ownership investors.

3. Beech Ridge states that it selected this location due to its wind energy development potential,

including terrain, geography, and above-ground wind speeds; its substantial distance from environmentally or culturally significant areas; its location near major electricity transmission facilities; the availability of privately-owned land with concurrent uses; and, the absence of any known critical habitats for threatened or endangered species. It further maintains that it sought areas located more than ten miles from National Parks, Wilderness Areas, and other environmentally or culturally sensitive areas.

4. The transmission line will be built entirely within new rights-of-way from private landowners.

5. The tract has been previously timbered and several parts of it have been surface mined for coal. MeadWestvaco told the Commission it expects these uses to continue.

owners.[6]

On April 25, 2006, the Commission conducted two hearings in Lewisburg, West Virginia, to receive public comment on Beech Ridge's application. Several hundred people attended each hearing and many in attendance voiced their opinions regarding the proposed project. On May 10, 11, 12, 16, 17, and 18, 2006, the Commission conducted evidentiary hearings at its office in Charleston, West Virginia. On August 28, 2006, the Commission entered an order granting the certificate to Beech Ridge. It did so, however, with numerous preconstruction and construction conditions including:

### General Preconstruction and Construction Certificate Issues

(1) Prior to commencing construction, Beech Ridge must file a verified statement indicating that all pre-construction conditions and requirements of the certificate have been met.

(2) Beech Ridge shall require all contractors to use standard noise buffers on all equipment and trucks.

(3) Beech Ridge shall require contractors to use pile driving equipment which have the least noise impact and restrict pile driving, during the weekdays, to 7 a.m. to 7 p.m.

(4) All construction activities should take place mostly during daylight hours.

(5) Construction activities should be limited during church hours.

(6) If dynamiting should become necessary, it should be limited to daylight hours and should follow all State and Federal rules, regulations, and laws.

(7) Beech Ridge must dispose of all contaminated soil and construction debris in approved landfills in accordance with appropriate environmental regulations.

(8) Beech Ridge must design, install and implement a fire protection system, using industrial best practices, in accordance with all applicable fire safety codes.

(9) Beech Ridge must coordinate with fire, safety and emergency personnel during all stages of the project to promote efficient and timely emergency preparedness and response.

(10) The siting and support transmission facilities certificates shall become invalid if Beech Ridge has not commenced a continuous course of construction within five years of the date the final certificate is granted or has not completed construction by the tenth year without petitioning the Commission for approval to expand these time frames, provided there are no material changes to the project that necessitate a reopening.

(11) Beech Ridge must file with the Commission evidence of any necessary environmental permits and/or certifications prior to commencing construction (including any letters from U.S. Fish & Wildlife, WVDNR, W.Va. Division of Cultural and History and West Virginia State Historic Preservation Office indicating either that Beech Ridge does not need to take further action or outlining what action Beech Ridge needs to take to be in compliance with that agencies rules/laws).

(12) Beech Ridge must file evidence of approval and/or acceptance of the wetlands delineation (Beech Ridge needs to file with the Commission written evidence of the Wetlands survey being completed and approved); the final endangered species study with any required mitigation plans; and the historical/archeological significance study with any required mitigation plans prior to commencing construction.

(13) Beech Ridge must file copies of the final Interconnection Agreements be-

**6.** The other individuals or groups granted intervenor status by the Commission included: Stephanie Mendelson, West Virginia State Building and Construction Trades Council, AFL–CIO, Michael A. Woelfel, John Walkup, Frank Young, Citizens for Responsible Wind Power, Inc., West Virginia Highlands Conservancy, Cleve Benedict, Jim Lakiotes, and Friends of Greenbrier County.

tween Beech Ridge and PJM prior to commencing operation.

(14) Beech Ridge must comply with the Endangered Species Act (16 U.S.C. § 1531 *et seq.*), the Migratory Bird Treaty Act (16 U.S.C. § 701 *et seq.*), and, if applicable, the National Environmental Policy Act of 1969 (42 U.S.C. § 4321 *et seq.*) in both the construction and operation of the Project. Should any authorized governmental agency or court with competent jurisdiction find that Beech Ridge is not complying with any one of the above three acts in either the construction or the operation of the Project, then Beech Ridge must notify the Public Service Commission in writing in this case of any such finding within ten (10) days of any such finding being made. Furthermore, the Commission may seek any legal remedies it has authority to seek, including injunctive relief, to address any such findings.

(15) Beech Ridge must file evidence of its EWG status from FERC prior to commencing operation.

(16) Beech Ridge must have a decommissioning fund in place prior to commencement of operation. The fund will cover dismantling of the turbines and towers, as well as land reclamation. The fund should be an escrow account, or a bond or a surety that is held by an independent party, such as the County Commission. This fund shall not be a part of Beech Ridge's assets. Beech Ridge must hire an expert to assess, from time to time, the size of the fund that would be needed, taking into consideration resale or salvage value. Beech Ridge must obtain the Commission's approval of the evaluative expert, as well as Commission approval of the periodic reports. The Commission reserves the right to also hire its own evaluative expert to evaluate any of the periodic reports.

(17) The construction of the I lines of turbines shall not occur unless all property owners agree to participate in the project.

(18) Beech Ridge should provide, if it has not already, a copy of the guaranty agreement between Beech Ridge and the Greenbrier County Commission whereby Beech Ridge agrees to pay at least $400,000 a year to the County. The Greenbrier County Commission may designate a fund for this minimum payment.

### General Operational Phase Certificate Issues:

(1) This condition applies at anytime— not just in the operational stage: If Beech Ridge should transfer its certificate, Beech Ridge must, pursuant to *Siting Rule* 7.1, notify the Commission in writing of the identity of the transferee and submit an affidavit from the transferee attesting to its willingness to abide by the terms of a siting certificate as issued.

(2) Beech Ridge must use licensed certified herbicide applicators.

(3) Beech Ridge must have the Material Safety Data Sheet filed on the plant site for all herbicides used on the transmission line right-of-way.

(4) Beech Ridge shall not use aerial spraying on its transmission line right-of-way.

(5) Beech Ridge shall provide the PSC with copies of all future interconnection studies and any interconnection agreement.

(6) Beech Ridge shall prohibit the use of lighting in the project area as much as possible. Beech Ridge may light the project as required by the FAA, or any applicable fire or safety code, regulation or accepted good utility practice.

(7) Beech Ridge will consult with a Technical Advisory Committee regarding the post-construction bat and bird studies. Membership shall be open to a representative of each of the following:

PSC,

US Fish and Wildlife Services,

WV DNR,

Bat and Wind Energy Cooperative,

A statewide environmental organization w/ 500+ members and in existence for at least 10 years,

A statewide bird group,

A private or academic institution with a background in avian issues,

Beech Ridge shall consult with the Technical Advisory Committee on the following;

(a) Three years of post-construction bat mortality and adaptive management studies, after operations commence, to assess: 1) the project's impact, if any, upon bat life, 2) the potential for adaptive management techniques to mitigate such impacts, and 3) the expected costs over a range of mitigation effectiveness levels.

(b) Three years of post-construction bird studies, after operations commence, to assess the impact, if any, on birds.

(c) A one year post-construction eagle/osprey study.

(d) If the project causes significant levels of bat or bird mortality and adaptive management techniques are proven effective and economically feasible, Beech Ridge and its successors will make a good faith effort to work with the Commission to apply parameters to implement facility-wide adaptive management strategies on an on-going basis.

(8) Beech Ridge shall update the Commission in writing twice a year on the studies being conducted. The update shall be directed to the attention of the Commission's Executive Secretary. Unless Beech Ridge obtains Commission consent for other deadlines, the updates shall be filed on or before January 30, and July 31 each year. Beech Ridge shall provide a copy of each report to the members of the Technical Advisory Committee.

(9) Beech Ridge's agreement to test adaptive management strategies shall be in effect immediately upon operation of the project. Beech Ridge may request modifications of its strategies in filings with the Commission.

(10) There have been concerns expressed at Backbone, under certain atmospheric conditions, that unnecessary lighting can contribute to additional bird mortality. Thus, Beech Ridge shall work with its employees and the FAA to minimize the impact that lighting will have upon the project's visibility.

(11) All of these terms apply to Beech Ridge, and to any subsequent owners/operators.

On September 18, 2006, MCRE filed its petition for reconsideration of the August 28, 2006, Commission order. On January 11, 2007, the Commission entered an order denying MCRE's petition for reconsideration. The Commission concluded that Beech Ridge had "substantially complied" with the pertinent regulations and that MCRE had presented no new information in its petition for reconsideration. Thereafter, on February 12, 2007, MCRE filed a petition for appeal with this Court. On that same day, Alicia and Jeffrey Eisenbeiss filed a pro se petition for appeal with this Court from the Commission's order. On April 18, 2007, this Court granted both MCRE's and the Eisenbeisses' petitions for appeal.

## II.

### STANDARD OF REVIEW

We set forth the standard of review of an order of the Commission in Syllabus Point 2 of *Monongahela Power Co. v. Public Service Commission*, 166 W.Va. 423, 276 S.E.2d 179 (1981), wherein we held:

In reviewing a Public Service Commission order, we will first determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. We will examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is

supported by substantial evidence. Finally, we will determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable. The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors.

We summarized our standard set forth in *Monongahela Power Co.* in Syllabus Point 1 of *Central West Virginia Refuse, Inc. v. Public Service Commission,* 190 W.Va. 416, 438 S.E.2d 596 (1993), where we held:

The detailed standard for our review of an order of the Public Service Commission contained in Syllabus Point 2 of *Monongahela Power Co. v. Public Service Commission,* 166 W.Va. 423, 276 S.E.2d 179 (1981), may be summarized as follows: (1) whether the Commission exceeded its statutory jurisdiction and powers; (2) whether there is adequate evidence to support the Commission's findings; and, (3) whether the substantive result of the Commission's order is proper.

Furthermore, we explained that: " '[A]n order of the public service commission based upon its finding of facts will not be disturbed unless such finding is contrary to the evidence, or is without evidence to support it, or is arbitrary, or results from a misapplication of legal principles.' *United Fuel Gas Company v. The Public Service Commission,* 143 W.Va. 33, 99 S.E.2d 1 (1957)." Syllabus Point 5, in part, *Boggs v. Public Service Comm'n,* 154 W.Va. 146, 174 S.E.2d 331 (1970). Syllabus Point 1, *Broadmoor/Timberline Apartments v. Public Service Commission,* 180 W.Va. 387, 376 S.E.2d 593 (1988). Syllabus Point 1, *Sexton v. Public Service Commission,* 188 W.Va. 305, 423 S.E.2d 914 (1992). With regard to the interpretation of an agency's rules or regulations, this Court has held, "[i]nterpreting a statute or an administrative rule or regulation presents a purely legal question subject to *de novo* review." Syllabus Point 1, *Appalachian Power Co. v. State Tax Dept. of West Virginia,* 195 W.Va. 573, 466 S.E.2d 424 (1995).

With these standards in mind, we now consider whether the Commission's final order is proper.

## III.

### DISCUSSION

These cases were consolidated because they arose out of the Public Service Commission's January 11, 2007, order, denying the appellants' petitions for reconsideration of its August 28, 2006, order, which conditionally granted the application of the appellee, Beech Ridge Energy, LLC, to build a wind-powered electric generating facility. Therefore, we will address each of the issues below.

#### A.

#### *The Commission's Findings of Fact and Conclusions of Law.*

In support of its argument that the Commission erred in denying its petition for reconsideration, MCRE argues that the Commission has arbitrarily rewritten, or ignored, its Exempt Wholesale Generator (EWG) Siting Rules to the detriment of the intervenors and the general public living within the vicinity of the project. First, MCRE maintains that the Siting Rules at issue were promulgated by the Commission to ensure that applications for siting certificates to construct and operate an EWG facility contain adequate data for the Commission to consider the potential impacts a project will have on areas within a five-mile radius of the project site.

MCRE contends, however, that the Commission's August 28, 2006, and January 11, 2007, orders, effectively relieved Beech Ridge of its duty to provide complete data concerning the area in the immediate vicinity of the project, and the potential impact that the project may have on cultural and historical resources located within the area. Specifically, MCRE states that due to the fact that the Commission allowed Beech Ridge to

file an inadequate and confusing map of the area within the five-mile radius of the project, the Commission's orders were necessarily devoid of findings of fact or conclusions of law regarding the impact of the proposed project on communities within the five-mile radius of the project.

MCRE further argues that while compliance with the EWG Siting Rules is a condition *precedent* to approval of an application for a siting certificate, the Commission's August 28, 2006, order, requires compliance with EWG Siting Rule 150 C.S.R. § 30–3–3.1.o as a condition *subsequent* to approval. According to MCRE, the Commission must follow the guidelines set forth in W.Va.Code § 24–2–11c(c), which provides,

> [I]n deciding whether to issue, refuse to issue, or issue in part and refuse to issue in part a siting certificate, the commission shall appraise and balance the interests of the public, the general interests of the state and local economy, and the interests of the applicant. The commission may issue a siting certificate only if it determines that the terms and conditions of any public funding or any agreement relating to the abatement of property taxes do not offend the public interest, and the construction of the facility or material modification of the facility will result in a substantial positive impact on the local economy and local employment. The commission shall issue an order that includes appropriate findings of fact and conclusions of law that address each factor specified in this subsection. All material terms, conditions and limitations applicable to the construction and operation of the proposed facility or material modification of the facility shall be specifically set forth in the commission order.

Thus, MCRE asserts that, in violation of this statute, the Commission created the situation whereby Beech Ridge had to submit critical information for review *after* its application had already been granted, and that such a result prohibited the Commission from properly "apprais[ing] and balanc[ing] the interests of the public, the general interests of the state and local economy, and the interests of the applicant." *See* W.Va.Code § 24–2–

11c(c). For instance, MCRE states that the Commission's requirement that Beech Ridge comply with the West Virginia State Historic Preservation Office (hereinafter, "SHPO") after being granted a siting certificate, prevents review by interested parties. MCRE argues that doing so allows an applicant to submit studies without formal notice to interested parties that may participate in the review process and without a formal procedure whereby a party can directly challenge the accuracy or completeness of the data submitted by the applicant. Thus, MCRE contends that the Commission erred in denying its petition for reconsideration.

In response, the Commission states that just because certain items mentioned in the Siting Rules are not included in an application, it does not mean the application is incomplete or that the Commission does not have the information it needs to perform the balancing test required by W.Va.Code § 24–2–11c. Moreover, it explains that there is simply certain information that cannot be supplied until after the proceeding before the Commission is completed and is more appropriate for another agency to carefully consider. As such, the Commission states that it balanced the interests of the applicant, the general interests of the state and local economy, and the interests of the public, and found that the positives of the project outweighed the negatives.

Beech Ridge maintains that the Commission properly reviewed the relevant issues, as required by the statute and regulations, and balanced the required interests in concluding that the building of this wind-generated plant should be approved. According to Beech Ridge, the Commission sufficiently documented the effects of the project on the local economy, the environment, and the local population, and that no less than six days of evidentiary hearings were conducted in connection with its application. Beech Ridge also contends that the Commission correctly refused to accept documents offered by the intervenors as evidence because the authors of the documents were not at the hearing and not subject to cross examination. Beech Ridge further states that its five-mile map was sufficient to meet all regulatory require-

ments in spite of MCRE's arguments to the contrary.

In addition, Beech Ridge asserts that MCRE's overly technical construction of the Siting Rules would force an applicant to trespass on private land in an effort to locate every conceivable feature in order to avoid dismissal of its application. According to Beech Ridge, such an interpretation was clearly not contemplated by either the Legislature or the Commission. Therefore, Beech Ridge concludes that the Commission's final order conditionally granting it a siting certificate should be affirmed.

Finally, it is the position of the Trades Council that the Commission properly appraised and balanced the interests of the citizens and communities located within the vicinity of the proposed project. As such, the Trades Council concludes that the Commission correctly determined that Beech Ridge substantially complied with the rules, and that the five-mile map was sufficient to allow the application to be fully debated.

■ We begin by pointing out that "[t]he Public Service Commission was created by the Legislature for the purpose of exercising regulatory authority over public utilities. Its function is to require such entities to perform in a manner designed to safeguard the interests of the public and the utilities. Its primary purpose is to serve the interests of the public. *Boggs v. Public Service Commission,* 154 W.Va. 146, 174 S.E.2d 331 (1970)." Syllabus Point 1, *West Virginia–Citizen Action Group v. Public Service Comm'n,* 175 W.Va. 39, 330 S.E.2d 849 (1985).

In this case, as previously noted, Beech Ridge sought approval of a siting certificate pursuant to W.Va.Code § 24–2–11c. As discussed earlier, W.Va.Code § 24–2–11c(c) provides that the Commission "shall appraise and balance the interests of the public, the general interests of the state and local economy, and the interests of the applicant." Thus, the Commission is required to balance these interests prior to granting a siting certificate. In addition, the Commission is guided by the Rules Governing Siting Certificates for Exempt Wholesale Generators, W.Va.C.S.R. tit. 150, § 150–1–1, *et seq.* (hereinafter, the "Siting Rules").

Of particular interest to MCRE in this case are 150 C.S.R. § 30–3–3.1.h.1 and 150 C.S.R. § 30–3–3.1.o. In 150 C.S.R. § 30–3–3.1.h.1, the rule provides that an applicant shall file a map with its application as follows:

5–mile radius Map. The applicant shall supply an ANSI size D map(s) of 1 inch: 4800 feet scale or larger containing at least a 5–mile radius from, and depicting, the proposed 24–2–1(c) generating facility and transmission lines, and showing the following features:

A. Major population centers and geographic boundaries;

B. Major transportation routes and utility corridors;

C. Bodies of water which may be directly affected by the proposed 24–2–1(c) generating facility;

D. Topographic contours;

E. Major institutions;

F. Incorporated communities; public or private recreational areas, parks, forests, hunting or fishing areas, or similar facilities; historic scenic areas or places; religious places; archaeological places; or places otherwise of cultural significance, including districts, sites, buildings, structures and objects which are recognized by, registered with, or identified as eligible for registration by the National Registry of Historic Places, or any state agency;

G. Land use and classifications; including residential, urban, manufacturing, commercial, mining, transportation, utilities, wetland, forest and woodland, pasture and crop land;

MCRE then relies on 150 C.S.R. § 30–3–3.1.o, which discusses cultural impact on the project area and provides that:

1. Landmarks.

A. The applicant shall estimate the impact of the proposed 24–2–1(c) generating facility on the preservation and continued meaningfulness of any historic, scenic, religious or archaeological areas or places; or places otherwise of cultural significance depicted on the map required by Rule 3.1.h.1.

B. Describe any plans to mitigate adverse impacts on these landmarks.

In its brief before this Court, the Commission states that Beech Ridge's application was the first application filed with its office after the issuance of the Commission's Siting Rules on September 10, 2005. The Commission explained that it,

had heard several other applications for authority to construct electric generation facilities. In those cases, the parties seemed to repeat requests for certain information about the project. Therefore, the Commission included this information in its rules in an effort to minimize discovery disputes and facilitate the development of a case. The Commission also requires the parties, including the applicant, to file pre-filed testimony before the hearing.

After Beech Ridge, the first applicant under these rules, made its filing, the Commission had to exercise its judgment as to the sufficiency of the filing in two respects. First, with regard to particular items challenged by the Petitioners including: maps, and associated designations of major transportation routes, water sources, religiously significant areas (churches and family cemeteries), the Commission had to determine whether the application was sufficient to constitute a filing that warranted review and consideration by the Commission. Second, the Commission had to evaluate the sufficiency of the filing as a whole based on the application, filed testimony, exhibits, and oral testimony.

█ Upon reviewing the voluminous record before us, we believe that the Commission did not ignore or revise its rules, nor did the Commission improperly interpret an unambiguous regulation. With regard to MCRE's concerns surrounding the map supplied by Beech Ridge, the Commission considered their argument, and in its August 28, 2006, order, it explained:

Siting Rule 3.1.h.1 requires applicants to provide an ANSI size D map of 1 inch to 4800 foot scale or larger. An ANSI size D map is 22″ by 34″. For facilities covering as many acres as Beech Ridge's, a project is too large to fit on a 22″ by 34″ map at 1″:4,800′ scale. Beech Ridge, then, provided an ANSI size D map showing the entire project at 1″:5,416.89′ scale, finding it preferable to have the entire project depicted on a single map, instead of two maps.

It is clear to us that the Commission made a reasoned decision when accepting Beech Ridge's filing of a map that changed the required scale by one-tenth-of-one-inch. The Commission determined, based on the size of the project, that it had a preference for a single map depicting the entire project. We fail to see the significance of how changing the map from one-inch to nine-tenths-of-one-inch impacted the application in a negative manner and prevented the Commission's overall goal of requiring Beech Ridge to adequately collect and document the relevant impact of the project, and to display them in a meaningful way to the Commission and the affected community members.

Likewise, we disagree with MCRE's contention that Beech Ridge's failure to include every required designation, as provided by the Siting Rules, on its five-mile map, prohibited the Commission from properly determining the complete impact the proposed project would have on the local communities. Specifically, MCRE states that the map did not include four churches, several private cemeteries, roads, springs, and other items that MCRE felt were of local significance. Beech Ridge's map did include, among other sites, eleven churches, three cemeteries, and three historic or cultural sites. Beech Ridge explained that in order to locate these sites, it consulted West Virginia University's GIS center for recreation sites and churches, SHPO for historical and cultural areas, and Greenbrier County and West Virginia tourism brochures and websites for recreational, historical, and cultural areas.

The Commission, in determining that the map was sufficient, found that the significance of local cemeteries, and whether local roads constitute major transportation routes, are matters upon which reasonable minds can differ. The Commission further determined that the project would have no impact on the water quality in the area, based upon the expert testimony that was presented. It also determined that one of the purposes of

the map is to give notice to the public of the potential impact of the project on the surrounding area, and that the appellants were given ample opportunity to express their concerns about anything in the area regardless of its depiction on the map. We believe that the Commission properly determined that Beech Ridge's map did not warrant dismissal of the project as it substantially complied with the Siting Rules.

█ Likewise, with regard to 150 C.S.R. § 30-3-3.1.*o.*, we believe that the Commission properly estimated the impact of the project on places of historic, scenic, religious, or cultural significance before granting a certificate to Beech Ridge. More specifically, MCRE disagrees with the Commission's decision to condition the certificate on compliance with the SHPO. Under W.Va.Code § 29-1-8,

The purposes and duties of the historic preservation section are to locate, survey, investigate, register, identify, preserve, protect, restore and recommend to the commissioner for acquisition historic, architectural, archaeological and cultural sites, structures and objects worthy of preservation, including human skeletal remains, graves, grave artifacts and grave markers, relating to the state of West Virginia and the territory included therein from the earliest times to the present upon its own initiative or in cooperation with any private or public society, organization or agency; to conduct a continuing survey and study throughout the state to develop a state plan to determine the needs and priorities for the preservation, restoration or development of the sites, structures and objects; to direct, protect, excavate, preserve, study or develop the sites and structures; to review all undertakings permitted, funded, licensed or otherwise assisted, in whole or in part, by the state for the purposes of furthering the duties of the section; to carry out the duties and responsibilities enumerated in the National Historic Preservation Act of 1966, as amended, as they pertain to the duties of the section; to develop and maintain a West Virginia state register of historic places for use as a planning tool for state

and local government; to cooperate with state and federal agencies in archaeological work; to issue permits for the excavation or removal of human skeletal remains, grave artifacts and grave markers, archaeological and prehistoric and historic features under the provisions of section eight—a of this article; and to perform any other duties as may be assigned to the section by the commissioner.

MCRE's concern is that reliance on SHPO means the Commission allows the applicant to submit relevant information after the certificate has been granted and that the applicant never estimated the impact to, and described mitigation plans for, areas of cultural importance as required by Siting Rule 3.1.*o.*1.

The Commission explained to this Court that compliance with SHPO actually adds another level of review and protection for the public. It pointed out that with the submission of the five-mile map by Beech Ridge, the applicant had already supplied the relevant items to the Commission prior to the granting of the certificate. Moreover, in addition to the map, Beech Ridge submitted pre-filed testimony of witnesses regarding cultural and historical matters. The Commission further explained that SHPO is the appropriate State agency for matters of historic significance, and the applicant is required to comply with any requirements of that agency, including any mitigating measures that office establishes as appropriate.

We see no error in granting the certificate to Beech Ridge based upon compliance with SHPO as it is in compliance with 150 C.S.R. § 30-5.5.1., which provides that,

In the event the applicant fails to obtain required permits from, or meet applicable requirements of applicable government agencies within 100 days of the date the application is filed, the Commission may issue a Siting certificate contingent upon receipt of such permits/approvals.

We find compelling the Commission's explanation that the Siting Rules are not designed simply to give the Commission and the parties notice as to the project's impact on the surrounding area, but they are also set forth to put the applicant on notice as to all the

information the Commission will need to consider to complete the permitting process. We further recognize that there will necessarily be certain information that simply cannot be supplied until after the process has been completed and is more appropriate for another agency to carefully consider. In the situation with SHPO, Beech Ridge must receive final approval on matters of culture and history as required by that state agency prior to beginning construction.

We also want to point out that the Commission declared during oral argument before this Court that the appellants will be afforded an additional opportunity to present their concerns during a future compliance hearing that will be established by the Commission. During this public meeting, MCRE and others will have the opportunity to evaluate Beech Ridge's SHPO compliance. Moreover, Beech Ridge must demonstrate to the Commission that it has satisfied the other preconstruction conditions or it will not be permitted to begin construction. Thus, the Commission's requirement of a future compliance hearing ensures Beech Ridge will obtain SHPO compliance and that any issues that agency identifies will be fully litigated and considered by the Commission.

 In addition to their specific arguments discussed above, both MCRE and the Eisenbeisses maintain that the Commission failed to adequately balance the interests of all parties involved and disregarded the interests of the public and the general interests of the state and local economies in approving Beech Ridge's application for a certificate. We disagree.

A thorough review of the record before us, along with the Commission's August 28, 2006, and January 11, 2007, orders, establish that the Commission entered into a substantial amount of analysis concerning the necessary interests and provided appropriate findings of fact and conclusions of law demonstrating a balancing of those interests as required by law. For instance, the Commission concluded that Beech Ridge showed a reasonable business interest in developing, constructing, and operating the proposed wind energy project. It further balanced that interest with that of the main property owner, MeadWest-

vaco, and its right to use its property in a manner it so desired.

The Commission further considered the general interests of the State and local economies. It stated that there is a verifiable need for electricity on the East Coast of the United States and pointed out that the estimated reserve margin (the difference between capacity and demand) will be reduced from 18% in 2005 to 4% in 2014, causing the region to have insufficient reserves to meet its peak demands. It also cited the fact that the current generating facilities are aging, and there is an increased need for renewable sources of electricity such as the instant EWG. The Commission recognized the long-term benefits to the State's residents in having West Virginia participate responsibly in the electric industry as well as ensuring the future availability of electricity to the State's residents.

The Commission also opined that the creation of additional jobs and tax revenues would provide substantial benefit to the local economy. It explained that the project is estimated to produce more than 200 construction jobs for an eight-to-ten-month period and is estimated to create fifteen to twenty permanent jobs, with an average salary of $35,000. Further, the project will generate at least $400,000 per year in revenue to Greenbrier County for twenty years pursuant to an agreement between the Greenbrier County Commission and Beech Ridge. Significantly, Beech Ridge will provide that amount even if the property assessments do not generate taxes in that amount. The State will also receive approximately $200,000 per year in property taxes. Finally, the Trades Council submitted an economic impact study and testimony regarding the positive economic benefits to the region, which were taken into consideration by the Commission.

With regard to balancing the interests of the public, the Commission noted that many citizens in the local vicinity of the project stated objections to it for a variety of reasons including loss of tourism, reduction in property values, noise, viewshed, and danger to birds and bats. The PSC then discussed each of those issues separately.

The Commission determined that in the areas of tourism and property values, there was never any concrete evidence introduced into the record showing any negative impact. It specifically noted that with regard to tourism, the only statements or opinions received were from the intervenors who opposed the project, and it found that such testimony amounted to conjecture and lacked foundation. As for property values, only Beech Ridge submitted a verified study on the potential effect on property values. It concluded, based on studies surrounding similar turbines in Tucker County, West Virginia, that the turbines would have no effect on property values. Moreover, while Mr. Eisenbeiss, a real estate appraiser, testified that he believed the turbines would negatively effect property values, he did not present any studies he had conducted concerning this topic. The Commission found that the property value arguments against the project were based on opinions, thus, did not constitute concrete evidence.

In addressing the concerns regarding the potential noise the project may produce, the Commission observed that the overwhelming majority of the turbines—more than ninety percent of them—will be located at least one mile from any residence. Additionally, the Commission concluded that the unrefuted testimony was that states that have imposed required set backs for turbines allow them to be 750 to 1,000 feet from structures. In the case at hand, Beech Ridge provided the only noise study performed for this project and its conclusions were that, for the most part, the noise in the project area was already greater than the noise the project was estimated to generate. According to the study, residents located 4,000 feet from the project could hear some noise, but the levels would be lower than the existing ambient levels. The Commission reviewed the study submitted by Beech Ridge, and acknowledged the intervenors' objections to portions of the study, but determined that the study was reliable.

The Commission also considered the visual impact of the project and stated that this was a hotly contested issue. It asserted that, "what one person considers beautiful, another may consider ugly, while yet others are indifferent. The same goes for wind turbines. Some people consider them eyesores they do not want in their backyards. Others consider them elegant or beautiful." The Commission concluded that the visual impact of the project was limited almost entirely to private residences.

The Commission then considered the impact of the project on birds and bats. It recognized that some birds, and most likely a larger number of bats, would be killed. However, it concluded that the evidence demonstrated that it was highly unlikely that any of the species killed would be endangered. It also stated that, in an effort to understand the interaction of bats and wind turbines, Beech Ridge was required to conduct studies and implement mitigation techniques once the project was operational in order to try and better understand the issue. Included in those mitigation techniques, according to the Commission, were measures such as putting brakes on the turbines so they would not spin unless the wind was strong enough to produce electricity and also increasing the cut-in speed, the wind speed at which turbines actually generate electricity. Moreover, as a part of the operational conditions of the certificate, the Commission created a Technical Advisory Committee whose membership is open to the Commission, the U.S. Fish and Wildlife Service, the West Virginia Division of Natural Resources, the Bat and Wind Energy Cooperate, a state-wide bird group, and a private or academic institution with a background in avian studies. The purpose of that committee is to consult with Beech Ridge on the following issues:

(a) The years of post-construction bat mortality and adaptive management studies, after operations commence, to assess 1) the project's impact, if any, upon bat life, 2) the potential for adaptive management techniques to mitigate such impacts, and 3) the expected costs over a range of mitigation effectiveness levels.

(b) Three years of post-construction bird studies, after operations commence, to assess the impact, if any, on birds.

(c) A one year post-construction eagle/osprey study.

(d) If the project causes significant levels of bat or bird mortality and adaptive management techniques are proven effective and economically feasible, Beech Ridge and its successors will make a good faith effort to work with the Commission to apply parameters to implement facility-wide adaptive management strategies on an on-going basis.

Thus, while the Commission recognized bird and bat mortality as a concern associated with the project, it believed that the Commission had taken appropriate and reasonable steps to mitigate those impacts. It further recognized that this was an area under the purview of the U.S. Fish and Wildlife Service, which would have the opportunity to require additional years of study or take any other action it deemed appropriate. Finally, the Commission specifically conditioned approval of the project on any further action required by the U.S. Fish and Wildlife Service.

The Commission next considered the fact that while many expressed opposition to the project, other members of the public voiced support of it for a variety of reasons including economic development and clean, renewable energy. It pointed out that the Sierra Club of West Virginia filed a letter of support for the project as long as certain conditions were met. The Commission also considered in its balancing of interests our recent decision in *Burch v. Nedpower Mount Storm*, 220 W.Va. 443, 453, 647 S.E.2d 879, 889 (2007), wherein we stated:

> Notably absent in this balancing of interests are the interests of nearby landowners whose use and enjoyment of their properties may be substantially interfered with by the operation of an electric generating facility. Because the rights of nearby landowners are not a primary consideration in the PSC's siting determinations, we believe it is necessary to preserve the traditional rights of these landowners to seek appropriate remedies in the circuit courts.

The Commission found that many of the negatives associated with the project related to the private interests of local landowners rather than the interests of the public as a whole, such as the viewshed, noise, and property value arguments presented for the Commission's consideration. The Commission then concluded that its decision was consistent with this Court's determination in *Burch* that the rights of local landowners are not the primary consideration in the balancing of interests.

Upon fully reviewing the record below, it is clear to us that the Commission considered substantial amounts of evidence and properly weighed the various interests involved. As we explained in Syllabus Point 2 of *Monongahela Power Co., supra*, "[t]he court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors." Accordingly, we believe that the Commission acted within its statutory authority by determining that it was reasonable to grant a siting certificate to Beech Ridge, and that such a finding is not "contrary to the evidence, or is without evidence to support it, or is arbitrary, or results from a misapplication of legal principles." *See* Syllabus Point 1, *Sexton v. Public Service Commission, supra.*

### B.

### The Commission's Duty to Undertake an Independent Investigation.

The Eisenbeisses argue that the Commission failed to conduct any thorough, independent evaluation of all respective positions presented in this case and thus, breached its statutory duty to protect the public in its review and approval of Beech Ridge's siting application. Therefore, the Eisenbeisses maintain that although W.Va.Code § 24–2–11c requires the Commission to balance the interests of the public, the general interest of the state and local economy, and the interests of the applicant, the Commission failed to fulfill that duty.

██ The Eisenbeisses state that the Commission erred in its May 5, 2006, denial of their March 30, 2006, motion that the Commission hire technical experts to conduct independent studies to evaluate all of the concerns raised by the intervenors. The Eisenbeisses maintain that they did not have the financial resources to pay for such studies and that the Commission staff did not have the expertise to evaluate the noise issues or the related health risks associated with a large-scale wind facility. Thus, according to the Eisenbeisses, the Commission failed to provide independent analysis of the economic viability to the public, the State, and the local economy, as required by law.

In response, the Commission determined that each party was responsible for developing and producing its own evidence to support its respective positions. Moreover, the Commission directed that its staff conduct a thorough, independent evaluation of everyone's position in the case, and that its staff did as directed. Finally, the Commission argues that the parties were not deprived of their right to submit their own studies, and did, in fact, submit evidence through public comment, which was fully considered by the Commission. Therefore, the Commission states that it did not abuse its discretion in balancing the interests of the public, the State, and local economy.

Likewise, Beech Ridge and the Trades Council agree that the Commission did not err in denying the Eisenbeisses' motion that the Commission pay for independent studies to support their various positions in this proceeding. These parties point out that while intervenors are certainly entitled to participate in all facets of the proceeding, this does not mean that the State is required to pay for an intervenor's attempt to prove its case. Moreover, Beech Ridge and the Trades Council maintain that there is no evidence to support a finding that the Commission staff failed in their duty to provide the Commission with an unbiased recommendation.

With regard to the Eisenbeisses' argument that the Commission failed to conduct any thorough, independent evaluation of all respective positions presented in this case, we disagree. During our disposition of the first argument in this case regarding the adequacy of the Commission's findings of fact and conclusions of law, we discussed the Commission's exhaustive review and independent evaluation of all evidence before it. Moreover, the Eisenbeisses' specific contention that the Commission's staff failed in its capacity to provide the Commission with reliable independent conclusions is insufficiently supported by the evidence before us and we find nothing in the record that would lead us to a contrary conclusion. As such, we do not believe that the Commission breached its statutory duty to protect the public in its review and approval of Beech Ridge's siting application, and we believe that the Commission properly balanced the interests of the public, the general interest of the State and local economy, and the interests of the applicant, as required by W.Va.Code § 24–2–11c.

Accordingly, we find no merit in the Eisenbeisses' argument that the Commission had a duty to appoint technical experts to conduct independent studies to evaluate concerns raised by all of the intervenors. Each party had sufficient opportunity to develop and produce evidence it deemed important to support their respective positions. In addition, the Commission's staff was able to review and analyze all of the evidence presented to it and then provide the Commission with an unbiased position. We see no evidence that the Commission exceeded its statutory powers and jurisdiction in this case and find that the record before us includes adequate evidence to support the Commission's findings. We further believe that the substantive result of the Commission's action is proper in light of the public interest and the applicant's interest. *See* Syllabus Point 1 of *Central West Virginia Refuse, Inc. v. Public Service Commission, supra.*

██ Moreover, as we held in Syllabus Point 2 of *WV Dept. of Health & Human Resources Employees Federal Credit Union v. Tennant,* 215 W.Va. 387, 599 S.E.2d 810 (2004), " 'An appellant must carry the burden of showing error in the judgment of which he complains. This Court will not reverse the judgment of a trial court unless error affirmatively appears from the record. Error will not be presumed, all presumptions being

in favor of the correctness of the judgment.' Syllabus Point 5, *Morgan v. Price*, 151 W.Va. 158, 150 S.E.2d 897 (1966)." Based upon all of the above, as well as our thorough review of the record, we find that there is no merit to the Eisenbeisses' argument.

In summary, we believe that the Commission acted within the scope of its authority and properly considered all of the evidence prior to issuing a final order addressing the pertinent issues. As such, the decision of the Commission in favor of granting a siting certificate to Beech Ridge is affirmed.

## IV.

### CONCLUSION

Accordingly, for the reasons set forth above, the final orders of the Public Service Commission entered on August 28, 2006, and January 11, 2007, are affirmed.

Affirmed.

Justice STARCHER dissents and reserves the right to file a dissenting opinion.

STARCHER, Justice, dissenting.

(Filed July 17, 2008)

History shows that the ownership of land is a powerful right, worthy of exceptional legal protection. Land is "the art of democracy" which every man "can shape in his own image." [1] For centuries, courts and legislatures have adopted a vast penumbra of rules designed to protect each person's right to freely use his or her property without interference from others.

The Public Service Commission has followed this historical tradition and adopted regulations dedicated to ensuring that public utilities fairly use their land without unduly imposing upon the rights of neighboring landowners.

I dissent because the Public Service Commission, and now the majority opinion, have decided that the formally adopted regulations of the Commission are more like "guidelines" than "actual rules." For instance, even

though the Commission's regulations require a utility to provide certain information (such as information about historical sites affected by a utility project) to the Commission *before* a permit is issued, the majority's opinion now allows that information to be provided *after* the permit is issued—ostensibly because that information is not important to the permit application process. My response to this position is, if the information is not critical to the permit application process, then why do the Commission's regulations require that the information be produced?

When the Public Service Commission authorizes the construction of gigantic industrial wind turbines in some of the most beautiful countryside of our State, I think that the Commission has a duty to fully take into account the effect of the turbines on the property values of adjoining and nearby landowners and communities. To do this, before issuing any permits, the Commission must require a utility seeking to build wind turbines to produce all of the information that is required by law or by regulation. It is not enough to say, as the majority implies, that those landowners can file a nuisance suit in the future. Before the State sanctions injuring both private property values and the aesthetic value of beautiful landscapes, the public utility must publicly demonstrate the scope of the injury as part of the record before the Commission grants any permits.

I would have remanded this case to the Commission for further study, and required Beech Ridge Energy to produce all of the legally required information about the impact of the wind turbines on neighboring property and aesthetic values.

I therefore dissent.

---

1. G.K. Chesterton, *What's Wrong With the World* (1910).