## STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**Ohio Valley Jobs Alliance, Inc.,**
**Richard Goodman, Frances Olenick,**
**Joseph Olenick, David Dami,**
**Jamie Vanhorn, and Jason Nuzum,**
**Petitioners**

**FILED**

**November 1, 2018**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**vs) No. 18-0249 (Public Service Commission of West Virginia No. 17-0521-E-CS)**

**The Public Service Commission of West Virginia,**
**West Virginia State Building and Construction Trades Council, AFL-CIO,**
**ESC Brooke County Power I, LLC, and**
**West Virginia Oil and Natural Gas Association,**
**Respondents**


## MEMORANDUM DECISION

Petitioners Ohio Valley Jobs Alliance (OVJA), Richard Goodman, Frances Olenick, Joseph Olenick, David Dami, Jamie Vanhorn and Jason Nuzum appeal the Public Service Commission of West Virginia (Commission) order granting a siting permit to ESC Brooke County Power I, LLC (ESC Brooke) for construction and operation of a natural gas powered wholesale electric generating facility in Brooke County, West Virginia.[1] Petitioners allege the Commission should have required ESC Brooke to submit a hypothetical tax estimate as part of its application, and that the Commission otherwise erred in finding that the project did not offend the public interest, and that the project would have a substantial positive impact on the local and state economies. While we agree with Petitioners that the Commission should have required the hypothetical tax estimate, we

---

[1] Petitioners are represented in this appeal by counsel William E. Robinson, Kelby Thomas Gray, Gregory J. Phillips (admitted *pro hac vice*), Emily V. Danford (admitted *pro hac vice*), and Robert Haffke (admitted *pro hac vice*). Respondent Public Service Commission is represented by counsel Robert M. Adkins, Jessica M. Lane, and Linda S. Bouvette. Respondent ESC Brooke is represented by counsel Lee F. Feinberg, Susan J. Riggs, and Grant P.H. Shuman. Respondent West Virginia Building and Construction Trades, AFL-CIO is represented by counsel Vincent Trivelli. Respondent Brooke County Commission is represented by counsel Joseph E. Barki, III. Respondent West Virginia Oil and Natural Gas Association is represented by counsel Mark D. Clark.

1

affirm given the substantial and uncontroverted weight of the evidence in favor of granting the siting permit.[2]

Because this case does not present a new or significant issue of law, and for the reasons set forth herein, we find this case is suitable for disposition in a memorandum decision pursuant to Rule 21(c) of the West Virginia Rules of Appellate Procedure.

## I.      Facts and Procedural History

Pursuant to West Virginia Code § 24-2-11c (2018 Repl. Vol.), ESC Brooke filed an application with the Commission for a siting permit authorizing the construction and operation of a natural gas powered wholesale electric generating facility.[3]   The proposed plant is not a public utility, but rather a federally authorized and regulated exempt wholesale generator (EWG).  So, ESC Brooke will not make retail sales to West Virginians, and therefore the project will not affect ratepayers.  Instead, ESC Brooke will make wholesale sales on the open energy market.  ESC Brooke remains wholly responsible for the costs of construction of the proposed plant, which are estimated to be $884 million.

The proposed plant location is a twenty-acre portion of the Cross Creek Wildlife Management Area in Brooke County, owned by the West Virginia Division of Natural Resources (WVDNR).  ESC Brooke and WVDNR entered into an Option to Lease Real Property relating to the twenty acres.  The Lease Agreement and a Master Sublease Agreement with the Brooke County Commission provide for a minimum lease payment to the Brooke County Commission of approximately $19 million dollars over a thirty-year period for use of the property, and additional compensation of $1 million dollars at the closing of the project's financing.

ESC Brooke, the Brooke County Commission, the Brooke County Board of Education, the Sheriff of Brooke County, and the Assessor of Brooke County entered into

---

[2] This Court acknowledges the participation of *amici curiae* in this case.  A brief in support of Petitioners was filed by the West Virginia Coal Association.  Briefs in support of Respondents were submitted by the Brooke County Commission, the Board of Education of Brooke County, West Virginia, and the Independent Oil and Gas Association of West Virginia, Inc.

[3] Petitioners intervened in the proceedings before the Commission. Respondents West Virginia State Building and Construction Trades Council, AFL-CIO, and the West Virginia Oil and Natural Gas Association (WVONGA) likewise intervened.  The West Virginia Department of Commerce was also party to the proceedings below and was represented by counsel Joshua L. Jarrell and Wesley H. White, but did not file a brief for this Court's consideration.

2

a PILOT (Payment In Lieu of Taxes) Agreement.[4] The PILOT Agreement states that ESC Brooke is exempt from ad valorem property taxes for a period of thirty years, and instead will make payments in lieu of taxes to be distributed to the Brooke County Board of Education and the Brooke County Commission. The property, being owned by the WVDNR, does not produce any ad valorem tax revenue at present, but the project would generate a minimum of $7,331,751 over the thirty-year term, subject to a CPI escalator of a minimum 2.5% per year. Evidence was presented to the Commission indicating that this type of agreement is designed to make West Virginia more competitive than, or at least on equal footing for business ventures with, for example, Pennsylvania, which has a different and more lenient tax calculation for electrical power generation as well as lower property taxes than that of Brooke County, which borders Pennsylvania.

ESC Brooke's extensive application contains a thorough explanation of the site location decision, environmental impact analysis, the PILOT Agreement, associated leases, and a lengthy discussion of the anticipated economic impact of the proposed project among other things. The Commission conducted a tour of the proposed site with representative parties and held a public comment hearing. Consistent with the procedural schedule set forth in a June 30, 2017 order, the parties were directed to file briefs and the Commission held an evidentiary hearing. The day before the evidentiary hearing, ESC Brooke, the West Virginia State Building and Construction Trades Council, AFL-CIO (Trades Council), the Commission staff attorneys, WVONGA, and the Department of Commerce filed a Joint Stipulation and Agreement for Settlement, jointly recommending that the siting permit be granted, subject to certain conditions.

ESC Brooke also represented that it had entered into a Memorandum Agreement with the Trades Council for which it sought Commission approval. The Memorandum Agreement ensures that to the extent reasonably possible, the workers used in the construction of the facility will be local workers who will be paid union wages. The Memorandum Agreement was admitted into evidence at the evidentiary hearing, which lasted for two days.

ESC Brooke presented its case for the siting permit, reiterating the points made in its application and appendix that detailed the practical aspects of the project such as gas procurement and construction.[5] It also presented witness testimony as to the economic impacts to Brooke County and to West Virginia. Tom S. Witt, Ph.D, an

---

[4] The PILOT Agreement is permitted by West Virginia Code § 8-19-4.

[5] The siting permit application process and consequent evidentiary hearing required a plethora of information that was provided to the Commission for consideration. We exclude much of this information from the discussion here only because Petitioners' claims revolve solely around the economic benefit to the public, including the creation of jobs, and the tax abatements provided by Brooke County.

economist, testified concerning the economic impact of the project. Dr. Witt generated a report projecting that a three-year construction period would result in 3,795 job years, $263.2 million in employee compensation, and $331 million in value added. Dr. Witt projected that in the first full year of the plant's operation, the project would result in 1,164 full and part-time jobs, $73.3 million in employee compensation, and $112.7 million in value added. He also estimated that $177.5 million per year of natural gas would be sourced through long-term fuel agreements, in addition to a gas interconnection at a cost of $55 million. Consequently, the total economic impact is estimated to be more than $880 million during construction and $287.4 million during operation. Moreover, the Trades Council, the Department of Commerce, WVONGA, the WVDNR, and even the Commission staff all presented witnesses whose testimony supported the substantial positive economic impact of the project.

As to the tax abatement under the PILOT Agreement, Commission staff requested that ESC Brooke provide an analysis of the hypothetical taxes it would have paid without aid of the tax abatement. ESC Brooke responded that the project would not be built in West Virginia without the PILOT agreement, but rather would simply be moved 800 feet into Pennsylvania for construction there because of that state's more lenient tax structure. Specifically, at the evidentiary hearing, ESC Brooke contended:

> 1. The [WVDNR] is not selling the property but leasing it to [ESC Brooke] and has not offered to sell the property.
>
> 2. In the event the [WVDNR] was selling the property, it is vacant, has no infrastructure, is not improved, and is a former coal mine site.
>
> 3. [ESC Brooke] would not own and develop the power plant without the PILOT [Payment in lieu of taxes agreement] and . . . no other prospective purchasers have approached the [WVDNR] to acquire the land, so presumably ad valorem taxes would still be $0.

After considering the evidence presented, the Commission entered an order on February 20, 2018, granting the siting certificate subject to the conditions outlined in the Joint Stipulation proposed by all parties save the Petitioners herein, and also subject to the

Memorandum Agreement between ESC Brooke and the Trades Council. This appeal followed.

## II.    Standard of Review

We employ a highly deferential standard of review when examining an order of the Public Service Commission:

> " ' "[A]n order of the public service commission based upon its finding of facts will not be disturbed unless such finding is contrary to the evidence, or is without evidence to support it, or is arbitrary, or results from a misapplication of legal principles." *United Fuel Gas Co. v. The Public Service Commission*, 143 W. Va. 33, 99 S.E.2d 1 (1957).' Syllabus Point 5, in part, *Boggs v. Public Service Comm'n*, 154 W. Va. 146, 174 S.E.2d 331 (1970)." Syllabus Point 1, *Broadmoor/Timberline Apartments v. Public Service Commission*, 180 W. Va. 387, 376 S.E.2d 593 (1988).[6]

As we have explained, our role is not to substitute our judgment for that of the Commission:

> In reviewing a Public Service Commission order, we will first determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. We will examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Finally, we will determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable. The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the

---

[6] Syl. Pt. 1, *Sexton v. Pub. Serv. Comm'n of W. Va.*, 188 W. Va. 305, 423 S.E.2d 914 (1992).

5

Commission has given reasoned consideration to each of the pertinent factors.[7]

Ultimately, we summarize our analysis as follows: "(1) whether the Commission exceeded its statutory jurisdiction and powers; (2) whether there is adequate evidence to support the Commission's findings; and (3) whether the substantive result of the Commission's order is proper."[8] With these standards in mind, we turn to the parties' arguments.

## III. Discussion

Petitioners allege that the Commission erred in granting ESC Brooke a siting permit because it was based on incomplete and inaccurate information. As to the completeness of the application, Petitioners allege that ESC Brooke was not made to provide an analysis showing the taxes it would have paid without the benefit of the tax abatements as required under the Commission's rules and by past precedent. As a facet of that argument, Petitioners argue that the Commission erred in excluding Petitioners' expert who would have testified regarding the tax abatement analysis, giving the Commission the requisite information to make a sound decision.

As to the inaccuracy of the information, Petitioners argue that even without the aid of the tax abatement analysis, the payments made by ESC Brooke under the agreements are so *de minimis* and disproportionately low that they patently offend the public interest. Likewise, Petitioners argue that the Commission erred in finding that there would be substantial economic impact to the West Virginia and local Brooke County economies as opposed to Ohio and Pennsylvania economies bordering the project.

We examine each of these arguments in turn.

The overarching statutory duty of the Commission under West Virginia Code § 24-2-11c(c) as it relates to the issuance of siting permits provides that the Commission should conduct a balancing test of various interests:

> In deciding whether to issue, refuse to issue, or issue in part and refuse to issue in part a siting certificate, the commission shall appraise and balance the interests of the public, the general interests of the state and local economy, and the interests of the applicant. The commission may issue a siting certificate only if it determines that the terms and

---

[7] Syl. Pt. 2, *Monongahela Power Co. v. Pub. Serv. Comm'n*, 166 W. Va. 423, 276 S.E.2d 179 (1981).

[8] Syl. Pt. 1, in part, *Central W. Va. Refuse, Inc. v. Pub. Serv. Comm'n of W. Va.*, 190 W. Va. 416, 438 S.E.2d 596 (1993).

conditions of any public funding or any agreement relating to the abatement of property taxes do not offend the public interest, and the construction of the facility or material modification of the facility will result in a substantial positive impact on the local economy and local employment.

In light of this statutory framework, the Commission has passed regulations, referred to as "Siting Rules."[9] Siting Rule 3.1.l.1.C relates to the tax abatement analysis:

If the project will have any funding from public sources, either initially or in the future, the amount and terms for such funding must be fully disclosed. Such disclosure shall include a listing of each source of public funding, a description of the public funding and a copy of the written agreement(s) setting forth the terms and conditions for the public funding. The disclosure shall include reasonable estimates of the amount of taxes the applicant would pay if, hypothetically, the applicant constructed and operated the 24-2-1(c) generating facility without the benefit of any agreements abating taxes. For purposes of this paragraph, public funding shall include:

1) loans, grants or contributions from the State or Federal government, any sub-division of the State or any public Board, Commission or similar entity;

2) leases or other uses of property owned by the State, any sub-division of the State or any public Board, Commission or similar entity;

3) abatement of any taxes.

Finally, the Commission has, in past decisions, required the tax abatement analysis as necessary to appropriately conduct its review of whether the public interest is offended. In its first decision after the statutory duty was imposed, *In re Longview Power* (*Longview I*),[10] the Commission stated "the Commission believes that a finding that public funding/tax abatement do not offend the public interest should be based on evidence as to

---

[9] The Rules Governing Siting Certificates for Exempt Wholesale Generators (Siting Rules) can be found at 150 C.S.R. Series 30.

[10] P.S.C. Case No. 03-1860-E-CS (Aug. 27, 2004).

the estimated amount of taxes that would have been paid by Longview if it built the Project without the Public Documents." *Longview I* created a two-step process to that end:

> In Part One of the analysis, the Commission will perform its duty to appraise and balance: (a) an applicant's interest to construct an electric wholesale generation facility; (b) the State's and region's need for new electrical generating plants; and (c) the economic gain to the State and the local economy, against: (i) community residents' interest in living separate and apart from such facility; (ii) a community's interest that a facility's negative impacts be as minimally disruptive to existing property uses as is reasonably possible; and (iii) the social and environmental impacts of the proposed facility on the local vicinity, the surrounding region, and the State.
>
> The Commission performs Part Two of its analysis only if it determines in Part One that, taken as a whole, positive impacts relating to the various interests outweigh the negative impacts on the various interests. (*See W. Va. Code* § 24-2-11c(c)). In Part Two the Commission decides whether a project's public funding, if any, and property tax abatement, if any, offends the public interest. (*W. Va. Code* § 24-2-11c(c)).[11]

Many facts of *Longview I* are strikingly similar to those in this case: Longview Power proposed a coal-powered power plant to be constructed on land that had been extensively strip-mined, and on which there were no competing offers.[12] The proposed site was owned by the state and therefore not then generating any tax revenue.[13] The lease structure and PILOT agreement were similarly arranged.[14] Longview's response to the Commission staff relating to the hypothetical tax calculation was much the same as ESC Brooke's, that is, that the project would not be completed without aid of the PILOT agreement.[15] And, in

---

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

that case, as we have previously discussed, the Commission conditioned Longview's siting permit, in part, on submission of the tax abatement analysis.

The parties returned in *Longview II*,[16] which included more discussion of the tax abatement analysis. Longview's taxation expert, Jerry Knight, testified that a hypothetical tax analysis of the duration of the PILOT agreement period was impracticable because, based on his thirty years of experience, the West Virginia State Tax Department would never estimate personal property taxes beyond the first year.[17] He also explained that because there are so many variables in a yet-to-be-constructed facility, the data necessary to analyze and estimate the property tax is at worst, unknown, and at best, unreliable.[18] Mr. Knight, on behalf of Longview, did, however, provide that first year's estimate of hypothetical tax revenue for the Commission's consideration.[19]

In its order in *Longview II*, the Commission accepted Mr. Knight's explanation that a thirty-year hypothetical analysis was unavailable under the circumstances. It instead accepted the one-year estimate as reasonable, and noted that "[t]he tax estimate does not stand on its own. It must be considered in the context of Longview's extensive testimony regarding the need for the PILOT agreement."[20]

Petitioners and Respondents read these administrative orders two different ways. Petitioners rely solely on *Longview I*, and make only sweeping generalizations that ESC Brooke has not presented "extensive testimony regarding the need for the PILOT Agreement" or any of the other information the Commission relied on in *Longview II*. Respondents, conversely, argue that *Longview II* effectively absolved parties of any obligation to provide the hypothetical tax calculation because it was "essentially a futile exercise" and only one small piece of a much larger puzzle.

We disagree to some extent with both characterizations. First and foremost, irrespective of what *Longview I* and *Longview II* might suggest, the Commission's own regulations *require* – that is, in *mandatory* terms – that the hypothetical tax calculation be submitted for consideration. We have discussed that

> "[a] regulation that is proposed by an agency and approved by
> the Legislature is a 'legislative rule' as defined by the State

---

[16] P.S.C. Case No. 03-1860-E-CS & 05-1467-E-CN (June 6, 2006).

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

9

Administrative Procedures Act, W. Va. Code, 29A-1-2(d) [1982], and such a legislative rule has the force and effect of law." Syl. Pt. 5, *Smith v. West Virginia Human Rights Comm'n*, 216 W. Va. 2, 602 S.E.2d 445 (2004). Accordingly, we reject any suggestion that [the W. Va. Code of State Rules] are mere "guides," a term with no legal significance, or are otherwise of no consequence.[21]

*Longview I* reiterated that requirement under similar conditions as those present here. *Longview II* simply amended what the Commission deemed "reasonable" under those circumstances as is permitted under the Siting Rules. The one-year estimate provided by Longview through Mr. Knight's testimony was, under those circumstances, reasonable and acceptable to the Commission. Here, however, we have similar circumstances as in *Longview I* and the Commission has declined to require the hypothetical tax analysis.

Respondents argued variously in briefs and at oral argument that the hypothetical tax calculation was either substantially complied with in accord with *Longview II*, or that it is, and perhaps always has been, a useless exercise. As for the contention that the analysis is a useless exercise, if the Commission and applicants have known, as contended, since *Longview II* that the hypothetical tax calculation was useless, or to use the Commission's terms, "an academic exercise that is not meaningful or probative in evaluating siting certificate applications," the Commission has had twelve years to amend its regulations requiring it. It has not done so. As recently as 2017, the two-step test devised in *Longview I* has been applied in siting permit applications, in which the Commission has interpreted part two of that test as requiring a reasonable estimate of the amount of taxes to be paid without aid of the tax abatement.[22] Nonetheless, the Commission argues that the hypothetical tax calculation was not a critical element of the Commission's evaluation of the tax abatement agreements in that 2017 case, or in other recent cases. Indeed, in those cases there was little, if any, evidence in the Commission's orders that the hypothetical tax calculation was a significant factor, let alone even provided by the applicant.

It is plain that the Commission's practical application of its regulations has caused confusion to applicants. Given that the Commission assures this Court that the hypothetical tax calculation is neither probative nor a significant factor, but merely one piece of a large puzzle, we urge the Commission to amend its regulations to that end and

---

[21] *Wooton v. Walker*, 237 W. Va. 193, 197, 786 S.E.2d 212, 216 (2016).

[22] *See ESC Harrison County Power, LLC*, P.S.C. Case No. 17-0036-E-CS (Oct. 27, 2017).

to explicitly overrule any *requirement* to provide the calculation drawn from *Longview I* or *II*.

As it relates to substantial compliance, Respondents rely on this Court's precedent in *Mountain Communities for Responsible Energy v. Public Service Commission of West Virginia*, 222 W. Va. 481, 665 S.E.2d 315 (2008), and *Wooton v. Walker*, 237 W. Va. 193, 786 S.E.2d 212 (2016). In *Mountain Communities*, we affirmed a decision of the Commission in which it had accepted, as substantially compliant, a map whose scale was $1/10^{th}$ of an inch from the required scale and which lacked inclusion of a few cultural sites that were arguably necessary.[23] We explained that we failed to appreciate how a $1/10^{th}$ inch difference in map scale negatively impacted the Commission's ability to debate the application, and that reasonable minds could differ as to the significance of including certain cemeteries and whether local roads constituted major transportation routes.[24] Likewise, in *Wooton*, this Court examined a candidate for public financing who had filed all required substantive information by the imposed deadline, but who submitted his sworn statement one day late.[25] The *Wooton* court explained that "'not all technical procedural violations merit relief where there is substantial compliance with *substantive* law.'"[26] Thus, because all substantive information was timely submitted, with the exception of a one-page *pro forma* cover letter statement, the Court determined that the late submission of the statement was of no real consequence nor did it cause harm to anyone.[27]

These two cases are different from the circumstances here. The hypothetical tax calculation is not a technical procedural requirement, but rather is a substantive submission. It is not as if the tax calculation was submitted late, or not properly proffered. It is not as if ESC Brooke attempted to comply and its estimates were not quite as accurate as had been hoped. We disagree to the extent ESC Brooke and the Commission argue that there was substantial compliance with this particular regulation. To say that ESC Brooke substantially complied with the specific requirement to provide the *hypothetical* tax

---

[23] *Mountain Communities*, 222 W. Va. at 492, 665 S.E.2d at 326.

[24] *Id.*

[25] *Wooton*, 237 W. Va. at 196, 786 S.E.2d at 215.

[26] *Id.* at 197, 786 S.E.2d at 216 (quoting *West Virginia Alcohol Beverage Control Administration and Division of Personnel v. Scott*, 205 W.Va. 398, 403, 518 S.E.2d 639, 644 (1999) (Workman, J., dissenting) (emphasis in original)).

[27] *Id.* at 199, 786 S.E.2d at 218.

11

calculation by using a threat denying the *actuality* of the project belies the definition of the word "hypothetical."

However, given that this particular requirement is but one small piece of the larger and extremely extensive application, we agree that ESC Brooke substantially complied with the Siting Rules as a whole. In the larger scheme of the evidentiary hearing and the overwhelming evidence presented that the project is in the public interest, in contrast to the total lack of admissible evidence presented by Petitioners to refute it, we are not inclined to reverse the decision of the Commission in granting the siting certificate.[28] As noted by the Commission, it had ample information with which to balance all of the respective interests and to reach a decision relating to the public interest.

Petitioners present no viable factual basis that the project does, in fact, offend the public interest so as to overcome the deference this Court affords to the Commission's findings. Instead, Petitioners ask this Court to impose new standards on the Commission's analysis. First, Petitioners seek to require that the Commission use the pro forma EBITDA statement (Earnings Before Interest, Taxes, Depreciation, and Amortization) and the payments made under the lease and PILOT Agreement to concoct some sort of acceptable ratio as to what does and does not offend the public interest. Not only are we wary of imposing such a test ex post facto, but we are also concerned that EBITDA does not accurately capture the financial circumstances typical of these types of projects. Neither the Commission nor this Court is in a position to regulate the rate of return a business may expect as a prerequisite to a siting permit by determining when it "could afford to pay more."

Similarly, use of an EBITDA/PILOT comparison alone is inappropriate because it would conflate earnings with profits. It ignores that the applicant seeking to do

---

[28] Petitioners' second assignment of error is that the Commission erred in excluding the testimony of Petitioners' expert, who Petitioner contends would have given the Commission the requisite hypothetical analysis. We note with irony that Petitioners' expert, Mr. Knight, who purported to give a thirty-year estimate of hypothetical taxes in this case, is the same Mr. Knight of the *Longview* cases, in which he testified that a thirty-year calculation was unreasonable and incapable of calculation.

We do not find that the Commission erred in excluding Mr. Knight's testimony. His "rebuttal" testimony can hardly be characterized as such, was submitted in contravention of prior discovery responses that OVJA was no longer pursuing a claim related to the PILOT Agreement and Lease Agreement, and was submitted nearly two months after the deadline and just eleven days prior to the evidentiary hearing. To have admitted Mr. Knight's testimony under the circumstances would have prejudiced the parties in preparing for the evidentiary hearing, and therefore it was properly excluded.

business in West Virginia takes all risk and is responsible for making principal and interest payments on debt-financing, as well as all income taxes. So, EBITDA is inaccurate as the only measuring stick for whether the public interest is offended, and in any case would nullify the import of negotiations made at arms-length between the applicant business and county agencies. For those reasons, Petitioners having presented no evidence to the contrary, we accept that the Commission has considered EBITDA with appropriate weight and in the appropriate context, and acknowledge that negotiations were conducted at arms-length by sophisticated parties, including both state and local officials, all of whom are in agreement that the project weighs heavily in the public interest.

We likewise decline Petitioners' request to change the standard of review required of siting permit applicants. Petitioners ask this Court to require clear and convincing evidence that the PILOT Agreement and associated leases do not offend the public interest. Petitioners base their argument on the premise that the tax abatements in this case should meet the heightened requirements of clear and convincing evidence required in *In re Tax Assessment of Foster Foundation's Woodlands Retirement Community*, 223 W. Va. 14, 672 S.E.2d 150 (2008). In that case, we held that parties who seek a reduced tax burden in property appraisal must meet the "clear and convincing" standard before the appropriate board and declared "[i]t is not unreasonable or unfair . . . to require the party claiming to have superior knowledge of the value of its own property to shoulder the burden of presenting such evidence to the decision maker."[29]

Of course, we are in a far different context here than in *Foster*. We are not considering an appeal from a tax appraisal, in which the tax assessor's assessment is presumed to be correct. [30] The case before us concerns the Commission's approval of a siting certificate that required consideration of a multitude of factors when assessing the offense to the public interest. PILOT agreements are specifically provided for by the Legislature to equalize opportunities for West Virginia – there is no presumption the applicant must overcome that the PILOT Agreement is ill-conceived.[31] While the burden of proof is on the applicant to prove the PILOT does not offend the public interest, to be sure, we see no cause to elevate this particular requirement to a heightened burden of proof above the many other considerations of the Commission in its analysis of those agreements in the siting permit application process.

The Commission had before it substantial evidence that the project did not offend the public interest and Petitioners never presented any evidence suggesting otherwise. The factual evidence is far from overcoming the deference this Court accords

---

[29] *Foster*, 223 W. Va. at 33, 672 S.E.2d at 169.

[30] *Id.* at 25, 33, 672 S.E.2d at 161, 168.

[31] *See* W. Va. Code § 8-9-14.

13

to findings of the Commission, and we will not set aside those findings by requiring a heightened standard of proof or creating a "one-size-fits-all" proportionality test of the project's projected earnings and payments under the PILOT Agreement.

Finally, Petitioners argue that the Commission erred in finding that there would be substantial positive impact to both the State and local economies, and local employment. Petitioners' argument is based on two issues they perceive in the Witt economic study report – the economic impact study conducted by ESC Brooke's economic expert, Dr. Witt. First, Petitioners argue the study is inaccurate because it assumes that the project will source West Virginia natural gas, and because it ignores that there would be substantial spill-over of jobs into Pennsylvania and Ohio.

Dr. Witt's analysis was created through use of IMPLAN software, a nationally recognized input-output modeling system used to examine the economic impact of projects such as this. It has been used frequently in this context and before the Commission. Petitioners do not argue that the algorithm itself is flawed, but rather that if the inputs are incorrect, the outputs are necessarily incorrect. Consequently, Petitioners find it was faulty for Dr. Witt to have assumed that natural gas would be sourced from West Virginia as opposed to Pennsylvania, and that his projections were high as it related to assumptions that employment would go to West Virginians as opposed to Pennsylvanians or Ohioans.

As to the natural gas sourcing, Petitioners ignore that the proposed project site is adjacent to a natural gas well pad. As the Executive Director of the West Virginia Oil and Natural Gas Association, who supports the project, testified, it is most economically prudent to source natural gas close to the production site so as to lower costs. Likewise, WVONGA detailed that the project would contribute to an increased demand for natural gas production, and due to the project, other natural gas producers and power plants would have access to infrastructure not previously available. ESC Brooke made assurances that while it might temporarily be necessary to use other sources of delivery providing access to an interstate pipeline to ensure a secure means of transportation for the financial markets, it has every intention of extracting natural gas from the adjacent well pad in West Virginia as soon as possible.

Relating to the assumption that the workers would be West Virginians, neither the parties nor Dr. Witt contemplated that *all* of the workers would be from West Virginia. As the Brooke County Commission aptly put, spillover into bordering states is expected in border counties throughout the state, and is no different from Brooke County residents seeking work in Pennsylvania or Ohio. It does not wholly discount the positive economic impact to West Virginia and Brooke County simply because there will be some spillover of employment into bordering states. Additionally, Petitioners' contention that there is no obligation to hire West Virginia workers is without support. The Memorandum Agreement ESC Brooke made with the Trades Council ensures that "to the extent

14

reasonably possible," local workers will be used. The agreement is binding on the successors and assigns of the parties, and the Trades Council entered the agreement on behalf of its members, to whom it owes a duty to bargain and to protect. Steve White, on behalf of the Trades Council, testified that although some of the workers from other states may fill some construction jobs, an estimated seventy-five percent would be filled by West Virginians, and "[n]o matter how you look at it, that's a lot of work for a lot of our members."

Given the current economic condition of West Virginia, and Brooke County, in particular, it is apparent that the project will substantially and positively impact the state and local economies. Petitioners have put forward no evidence sufficient to convince us that the Commission was wrong in relying upon Dr. Witt's estimates in this regard.

## IV. Conclusion

For the foregoing reasons, we affirm the February 20, 2018 order of the Public Service Commission.

Affirmed.

**ISSUED:** November 1, 2018

**CONCURRED IN BY:**

Chief Justice Margaret L. Workman
Justice Elizabeth D. Walker
Justice Paul T. Farrell, sitting by temporary assignment
Justice Tim Armstead
Justice Evan H. Jenkins

Justice Allen H. Loughry II suspended and therefore not participating.